**Slip Op. 08-57**

UNITED STATES COURT OF INTERNATIONAL TRADE

————————————————————— :
                                       :

THE POMEROY COLLECTION, LTD.,
                                        :

                  *Plaintiff*,
                                         :

              v.                          Court No. 05-00103

                                         :

UNITED STATES,
                                         :

                  *Defendant.*
————————————————————— :

[Plaintiff's motion for summary judgment granted; Defendant's cross-motion for summary judgment denied.]

Dated: May 27, 2008

      Fitch, King and Caffentzis (Peter J. Fitch), for Plaintiff.

      Gregory G. Katsas, Acting Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Bruce N. Stratvert); Beth C. Brotman, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, U.S. Department of Homeland Security, Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

      Plaintiff Pomeroy Collection, Ltd. commenced this action to challenge the decision of the

United States Customs Service ("Customs")[1] denying Pomeroy's protests concerning the tariff

———————————

      [1]The U.S. Customs Service – formerly part of the U.S. Department of Treasury – is now part of the U.S. Department of Homeland Security, and is known as U.S. Customs and Border Protection. The agency is referred to as "Customs" herein. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1502, 116 Stat. 2135, 2308-09 (2002); 72 Fed. Reg. 20,131 (April 23, 2007).

classification of a variety of pieces of merchandise imported from Mexico in 2000.  Customs

classified the merchandise as "[g]lassware of a kind used for table, kitchen, toilet, office, indoor

decoration or similar purposes . . . ," under five different subheadings of heading 7013 of the

Harmonized Tariff Schedule of the United States ("HTSUS"), assessing duties at rates ranging from

3.8 % to 16 % *ad valorem*.  *See* Heading 7013, HTSUS (2000).[2]  Pomeroy, in turn, asserts that –

depending on the item – the merchandise should have been classified either as "[l]amps and lighting

fittings" under HTSUS heading 9405 or as "[c]andles, tapers and the like" under heading 3406, and

liquidated duty-free.  *See* Complaint; Headings 3406 & 9405, HTSUS.

Customs now concedes that all but four of the numerous pieces of merchandise at issue in

this action are, indeed, properly classifiable as Pomeroy claims.  *See generally* Plaintiff's Brief In

Support of Its Motion for Summary Judgment ("Pl.'s Brief") at 1, 17; Plaintiff's Reply to

Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Plaintiff's Opposition to

Defendant's Motion for Summary Judgment ("Pl.'s Reply Brief") at 32 n.5; Defendant's

Memorandum in Support of Its Motion for Summary Judgment and In Opposition to Plaintiff's

Motion for Summary Judgment ("Def.'s Brief") at 1 n.1, 3 n.3 ; Defendant's Reply Brief In Support

---

[2]The HTSUS consists of the General Notes, the General Rules of Interpretation ("GRIs"), and the Additional U.S. Rules of Interpretation ("ARIs"), including all section and chapter notes and article provisions, as well as the Chemical Appendix.  *See*, *e.g.*, BASF Corp. v. United States, 482 F.3d 1324, 1325-26 (Fed. Cir. 2007) (citations omitted); Libas, Ltd. v. United States, 193 F.3d 1361, 1364 (Fed. Cir. 1999) (noting that "HTSUS is indeed a statute but is not published physically in the United States Code") (*citing* 19 U.S.C. § 1202).

All citations herein are to the 2000 edition of the HTSUS.  Further, all tariff provisions at issue in this action are properly preceded by the prefix "MX," to indicate that the merchandise qualifies for the duty rate applicable to products of Mexico.  However, the prefix is otherwise irrelevant to the classification analysis, and is therefore generally omitted herein.

of [Its] Motion for Summary Judgment and In Opposition to Plaintiff's Response ("Def.'s Reply Brief") at 6.

Pending before the Court are the parties' cross-motions for summary judgment as to the four pieces of merchandise that remain in dispute. Jurisdiction lies under 28 U.S.C. § 1581(a) (2000).[3] Customs' classification decisions are subject to *de novo* review pursuant to 28 U.S.C. § 2640.

As discussed in greater detail below, all four pieces of merchandise still at issue are properly classifiable under HTSUS subheading MX 9405.50.40, as "Lamps and lighting fittings . . . : Non-electrical lamps and lighting fittings: Other: Other," and are thus duty-free. Pomeroy's motion for summary judgment is therefore granted, and the Government's cross-motion is denied.[4]

## I. Background

Although Customs now concedes that the vast majority of the items at issue in this action are properly classifiable as Pomeroy claims, and are therefore duty-free, four pieces of merchandise remain in dispute – the Geo Table Lighting, the St. Tropez CLS, the St. Tropez Cardinal Bowl, and the Serenity Votives.

### A. Geo Table Lighting

As imported, the Geo Table Lighting (article # 291517) consists of a rustic iron stand roughly 15 inches tall (including a rustic iron "cradle" that hangs from the top of the stand), a bell-

---

[3] All statutory citations herein are to the 2000 edition of the United States Code.

[4] Judgment also will be entered as to the classification of all those pieces of merchandise on which the parties have reached agreement.

shaped glass vessel approximately five-and-one-half inches tall (with a top opening approximately five inches in diameter, or six-and-three-fourths inches including the lip), a packet of sand, a packet of small granite rocks, and a vanilla-scented pillar candle (three inches in diameter and two inches tall), all packaged in a box bearing photos of the merchandise as assembled. *See* Pl.'s Exh. 2 (sample of Geo Table Lighting, in box); Pl.'s Exh. 6 (Pomeroy Price List, including sketch of "Geo Table Lighting" under caption "Pillar Holders").

As depicted in the photos on the box in which the merchandise is sold, the Geo Table Lighting is assembled by pouring the sand into the bottom of the glass vessel, positioning the candle on top of the sand, arranging the stones around the base of the candle, inserting the glass vessel into the "cradle," and hanging the "cradle" on the hook at the top of the iron stand. In addition to the large, attractive color photos of the fully-assembled merchandise (which are featured on the top and all four sides of the box), the box is also prominently labeled "Geo Table Lighting," as well as "San Miguel Candle Lamps" on the top and all four sides of the box, and advises shoppers "Candle, Stones & Sand Included." Other promotional language on the box emphasizes "Graceful rustic finish iron stand holds glass bowl," "Includes vanilla-scented candle, granite rocks and sand," and "Enchanting accent for patio, casual areas indoors or out." *See* Pl.'s Exh. 2 (photo box, containing sample of Geo Table Lighting).

### B. St. Tropez CLS and St. Tropez Cardinal Bowl

The St. Tropez CLS (article # 571008) consists of a rustic iron stand roughly five-and-three-fourths inches tall, a bell-shaped glass vessel approximately five-and-one-half inches tall (with a top opening approximately six inches in diameter, or eight inches including the lip), a packet of stones,

and three vanilla-scented floating candles (each approximately two-and-three-fourths inches in diameter and one inch tall), all packaged in a box bearing photos of the merchandise as assembled. *See* Pl.'s Exh. 3 (sample of St. Tropez CLS, in box); Pl.'s Exh. 6 (Pomeroy Price List, including sketch of "St. Tropez" under caption "Floating Candle Holders").

As depicted in the photos on the box in which the merchandise is sold, the St. Tropez CLS is assembled by inserting the glass vessel into the iron stand, placing the stones in the bottom of the vessel, filling the vessel with water, and floating the three candles on the surface of the water. In addition to the large, attractive color photos of the fully-assembled merchandise (which are featured on the top and all four sides of the box), the box is also prominently labeled "St. Tropez CandlePot," as well as "St. Tropez by San Miguel Candle Lamps" on the top and all four sides of the box, and advises shoppers "Candles and stones included." Other promotional language on the box emphasizes "Rustic Finish iron frame holds a glass bowl to fill with stones and floating candles," "Includes three vanilla-scented floating candles plus stones," and "Lighting of exceptional warmth and beauty." *See* Pl.'s Exh. 3 (photo box, containing sample of St. Tropez CLS).[5]

Although no sample of the St. Tropez Cardinal Bowl (article # 571022) was submitted as an exhibit, the merchandise is virtually identical to the other St. Tropez merchandise at issue, the St. Tropez CLS described immediately above. The sole differences between the two pieces of merchandise are that the St. Tropez Cardinal Bowl includes a packet of faux "gems" made of glass

---

[5]The box containing the St. Tropez CLS sample submitted to the Court states that that particular merchandise was "Handcrafted in China." *See* Pl.'s Exh. 3 (photo box, containing sample of St. Tropez CLS). However, there is no dispute that the actual merchandise in the entries at issue in this action are all products of Mexico. *See* Pomeroy Affidavit ¶ 7.

(in lieu of a packet of stones), and a stand that is gold/bronze in color (rather than rustic iron).  The

St. Tropez Cardinal Bowl is assembled by inserting the glass vessel into the gold/bronze-colored

stand, placing the faux "gems" in the bottom of the vessel, filling the vessel with water, and floating

the three candles on the surface of the water (as shown in the photo on the box of the other St.

Tropez item, the St. Tropez CLS).

Pomeroy emphasizes that the two contested St. Tropez items (the St. Tropez CLS and the

St. Tropez Cardinal Bowl) are essentially just slightly larger versions of Pomeroy's Calder Mini

Table Bowl – a piece of merchandise which Customs now concedes is properly classified under

heading 9405 ("[l]amps and lighting fittings"), and which Pomeroy asserts is "identical in function"

to all four pieces of merchandise in dispute.[6]  *See* Pl.'s Brief at 11-12; *see also id*. at 5, 16; Pl.'s

---

[6]The Calder Mini Table Bowl (item # 957703 and item # 957710) consists of an iron stand (either rustic wrought iron, or gold/bronze-colored) which is roughly four-and-three-fourths inches tall, a bell-shaped glass vessel approximately four-and-one-fourth inches tall (with a top opening approximately three-and-three-fourths inches in diameter, or five-and-one-half inches including the lip), a packet of either stones (supplied with the rustic iron stand) or faux glass "gems" (supplied with the gold/bronze-colored stand), and one vanilla-scented floating candle (approximately two-and-three-fourths inches in diameter and one inch tall), all packaged in a box bearing photos of the merchandise as assembled.  *See* Pl.'s Exh. 5 (sample of Calder Mini Table Bowl, in box); Pl.'s Exh. 6 (Pomeroy Price List, including sketch of "Calder Mini Table Bowl" under "Floating Candle Holders").

As depicted in the photos on the box in which the merchandise is sold, the Calder Mini Table Bowl is assembled by inserting the glass vessel into the iron stand, placing the stones or "gems" in the bottom of the vessel, filling the vessel with water, and floating the candle on the surface of the water.  In addition to the large, attractive color photos of the fully-assembled merchandise (three of which show the merchandise with stones, while the other two photos show it with "gems"), the box is also prominently labeled "Calder Mini Floater," as well as "San Miguel Candle Lamps" on the top and all four sides of the box, and advises shoppers "Candle and stones or gems included."  Other promotional language on the box emphasizes "Rustic finish iron frame holds a glass insert filled with small stones and a vanilla-scented floating candle," "Gold finish iron frame holds a glass insert filled with glass gems and a vanilla-scented floating candle," and "Opening [in the box] shows color

Reply Brief at 8-9.  *Compare* Pl.'s Exh. 3 (sample of St. Tropez CLS, in box) *and* Pl.'s Exh. 5 (sample of Calder Mini Table Bowl, in box); *see also* Pl.'s Exh. 6 (Pomeroy Price List, including sketches of both "Calder Mini Table Bowl" and "St. Tropez" merchandise, under "Floating Candle Holders").

## C.  Serenity Votives

The fourth, and final, piece of merchandise in dispute – the Serenity Votives (article # 633058) – consists of three cylinder-shaped glass vessels of varying heights (approximately ten-and-one-half inches tall, eight inches tall, and five-and-three-fourths inches tall,[7] each with a top opening approximately three inches in diameter, or four-and-one-half inches including the flared lip), as well as a packet of stones, and three vanilla-scented floating candles (each approximately two-and-three-fourths inches in diameter and one inch tall), all packaged in a box bearing photos of the merchandise as assembled.  *See* Pl.'s Exh. 4 (sample of Serenity Votives, in box); Pl.'s Exh. 6 (Pomeroy Price List, including sketch of "Serenity Votives" under caption "Floating Candle Holders").

As depicted in the photos on the box in which the merchandise is sold, the Serenity Votives are assembled by placing the stones in the bottoms of the glass vessels, then filling the vessels with water and floating a candle on the surface of the water in each.  In addition to the large, attractive color photos of the fully-assembled merchandise (which are featured on the top and all four sides

---

of iron frame inside."  *See* Pl.'s Exh. 5 (photo box, containing sample of Calder Mini Table Bowl, with opening in box to allow viewing of contents).

[7]The shortest of the three glass cylinders was broken in transit, and therefore was not included in the sample submitted to the Court.  *See* Pl.'s Exh. 4 (sample of Serenity Votives, in box).

of the box), the box is also prominently labeled "Serenity Glass Votive Trio," as well as "San Miguel Candle Lamps" on the top and the two largest sides of the box, and advises shoppers "Candles & Stones Included." Other promotional language on the box emphasizes "Three graduated glass columns float votive candles above bases filled with water and pebbles," "Stones and three vanilla-scented candles included," and "Enchanting light for buffet or dinner table." *See* Pl.'s Exh. 4 (photo box, containing sample of Serenity Votives).

### D. Customs' Classification of the Four Contested Pieces of Merchandise

According to Pomeroy, the four pieces of merchandise which remain in dispute – the Geo Table Lighting, the St. Tropez CLS, the St. Tropez Cardinal Bowl, and the Serenity Votives – are all properly classifiable under HTSUS subheading 9405.50.40, as "Lamps and lighting fittings . . : Non-electrical lamps and lighting fittings: Other: Other," and thus should be duty-free.

Customs liquidated the Geo Table Lighting merchandise and the St. Tropez merchandise (including the St. Tropez CLS merchandise, as well as  the St. Tropez Cardinal Bowl merchandise) under subheadings 7013.39.50 and 7013.39.60, respectively, as "Glassware of a kind used for table, kitchen . . . or similar purposes . . . : Glassware of a kind used for table (other than drinking glasses) or kitchen purposes other than that of glass-ceramics:  Other: Other: Valued over $3 each: Other," and assessed duties at the rate of either 8 % or 3.8 % *ad valorem*, depending on the value of the merchandise.   The Government has since abandoned those classifications, however, and now contends that the Geo Table Lighting merchandise and the St. Tropez merchandise should be classified under subheadings 7013.99.80 and 7013.99.90, respectively, as "Glassware of a kind used for . . . indoor decoration or similar purposes . . . : Other glassware: Other:  Other: Other: Valued

over $3 each: Other," dutiable at the rates of 8 % or 3.8 % *ad valorem*, depending on the value of

the merchandise.

The Government maintains that Customs properly liquidated the Serenity Votives under

subheading 7013.99.80 (quoted above), assessing duties at the rate of 8 % *ad valorem*.

### E.  HQ 960499 and Similar Customs Ruling Letters

Customs issued no ruling specific to the merchandise at issue in this action.  Instead, in

defense of its asserted classifications, the Government relies on HQ 960499 and several other ruling

letters.  *See* Def.'s Brief at 6 & n.4 (*citing* HQ 960475 (June 30, 1998); HQ 960499 (July 8, 1998);

HQ 960962 (July 15, 1998); HQ 960819 (July 16, 1998); HQ 961095 (July 20, 1998); HQ 961211

(July 23, 1998)).  In those ruling letters, Customs classified assorted merchandise either as

"decorative glassware" under heading 7013 or as "candle holders" under heading 9405, based on

what were then newly-developed agency criteria.[8]

---

[8]In contrast to the four pieces of merchandise at issue in the case at bar, none of the merchandise at issue in the ruling letters cited by the Government included candles – not even those pieces of merchandise which Customs ultimately classified as "candle holders" under heading 9405. *See* HQ 960499 (merchandise without candle classified under heading 9405); HQ 960962 (same); HQ 960819 (same); HQ 961095 (same); HQ 961211 (same).

Indeed, in a number of those rulings, Customs classified the merchandise in question under heading 9405 even though it not only did not include a candle, but – in fact – was actually marketed and sold as something other than a candle holder.  *See* HQ 960819 (classifying as candle holder under heading 9405 a bell-shaped, "crackle"-finish glass "potpourri holder," with brass stand); HQ 961095 (classifying as candle holder under heading 9405 a clear glass, bell-shaped potpourri holder with metal stand, packaged with potpourri and sold in display box labeled "Potpourri Gift Set"); HQ 961211 (classifying as candle holder under heading 9405 a flowerpot-shaped serving dish made of green-tinted glass with metal stand, packaged in container which describes merchandise as "Garden Server" and depicts it being used to serve salsa).

Customs' analysis in HQ 960499 and most of the other cited ruling letters begins by assuming that the merchandise at issue in the ruling is a "composite good" or a "set" subject to GRI 3(b) and its "essential character" inquiry, and does not consider whether that merchandise might be classified pursuant to any of the preceding GRIs (specifically, GRI 1 through GRI 3(a)). *See* HQ 960499 (composite goods); HQ 960819 (composite good); HQ 960962 (composite goods and sets); HQ 961095 (set).

In addition, HQ 960499 and the other cited ruling letters treat the relevant subheadings of both heading 7013 and heading 9405 as "principal use" provisions, implicating Additional U.S. Rule of Interpretation ("ARI") 1(a). ARI 1(a) provides for classification "in accordance with the use in the United States at, or immediately prior to, the date of importation, of *goods of that class or kind*

---

On the other hand, in a number of the rulings on which the Government relies, Customs refused to classify merchandise under heading 9405, even though the merchandise was marketed and sold as a candle holder (although it did not include a candle). *See* HQ 960475 (classifying under heading 7013 a flowerpot-shaped glass article with packaging that depicts merchandise with a votive or pillar candle burning in it, which is sold and – to importer's knowledge – principally used as candle holder); HQ 960962 (classifying under heading 7013 a pith helmet-shaped glass article with metal stand, although "marketing literature" describes item as "candle holder"); *see also* HQ 960499 (classifying under heading 7013 various articles of "caged glass" (glass blown into a metal frame), which – according to the protestant – "are sold by the importer as candle holders, although they can be used in a number of ways").

In fact, in rulings that the Government does not cite, Customs has refused to classify under heading 9405 merchandise which both included a candle and was marketed and sold as a candle holder. *See*, *e.g.*, HQ 961866 (July 29, 1998) (classifying under heading 7013 merchandise consisting of three cylinder-shaped pieces of glassware of graduated heights, packaged with a floating candle).

In HQ 960499 and each of the five other rulings that the Government cites (as well as HQ 961866, cited above), Customs classified the merchandise based solely on the size (and, in some cases, also the shape) of the glass component alone, as discussed in greater detail below.

*to which the imported goods belong*," and specifies that "the controlling use is the principal use."

*See* ARI 1(a) (emphasis added); HQ960475; HQ 960499; HQ 960819; HQ 960962; HQ 961095; HQ

961211.

As noted above, HQ 960499 and the other cited ruling letters also apply the criteria that

Customs developed to distinguish between merchandise classifiable as "decorative glassware" under

heading 7013 and merchandise classifiable as "candle holders" under heading 9405.  According to

the Government, "[i]n order to more fairly and consistently apply ARI 1(a) to merchandise involving

glassware of the kind at issue [here], Customs developed criteria based upon information regarding

use, received from various industry sources in connection with a notice published in the March 25,

1998, Customs Bulletin . . . proposing to modify or revoke certain glassware rulings."  *See* Def.'s

Brief at 6-7 (*citing* "Proposed Modification or Revocation of Ruling Letters Relating to Tariff

Classification of Bell-Shaped and Similarly Shaped Glassware," 32 Customs Bulletin 32-68 (March

25, 1998)).[9]

As set forth in HQ 960499, the criteria that Customs applies to distinguish between

merchandise classifiable as decorative glassware under heading 7013 and merchandise classifiable

as candle holders under heading 9405 focus solely on the glass vessel, and draw a bright line based

on the size (and, to some extent, the shape) of that piece alone:

---

[9]The actual information and documentation that Customs received from industry sources, on which the criteria set forth in HQ 960499 were based, was forwarded from agency headquarters to Customs' National Import Specialist Division in New York, and was subsequently lost in the September 11, 2001 attack on the World Trade Center (where the Division's offices were located at the time).  However, according to the Government, Customs headquarters had prepared (and retained) a summary of the catalogue and advertisement information submitted in response to the March 25, 1998 Customs Bulletin notice.  *See* Def.'s Brief at 11.

Based on [information received in response to the March 25, 1998 Customs Bulletin notice], Customs has concluded that the class or kind for goods such as those under consideration is defined by the form or shape of the article (*e.g.*, bell-shape, similar to bell-shape, flower pot shape, tulip or flower petal shape, cube or rectangle shape, disk shape, bowl shape, and other shapes) and its size. We have found there to be a clear distinction between glassware used as candle holders and that used for general indoor decoration based on the size of the articles, in the absence of other pertinent evidence or information. *Glassware with an opening of 4 inches or less in diameter and a height or depth of 5 inches or less is used substantially more frequently as a candle holder* than for any other purpose, according to the information we have obtained, *and larger glassware is used substantially more frequently for general indoor decoration.*

HQ 960499 (emphases added).[10]

_____

[10]Pomeroy harshly criticizes Customs' development of its size criteria, particularly as applied to larger articles (*i.e.*, glassware taller than five inches and/or with an opening more than four inches in diameter). Specifically, Pomeroy emphasizes that the March 25, 1998 Customs Bulletin notice was withdrawn by the agency, and – even more to the point – that none of the articles at issue in that notice was taller than five inches and/or had an opening more than four inches in diameter. *See generally* Pl.'s Reply Brief at 23-25, 28-29.

As Pomeroy notes, the March 25, 1998 Customs Bulletin notice proposed to modify or revoke various existing agency ruling letters classifying as candle holders under heading 9405 certain flowerpot-shaped glassware and other iron and glass articles, and to re-classify that merchandise as decorative glassware under heading 7013. *See* Pl.'s Reply Brief at 23. However, as Pomeroy correctly points out, Customs later withdrew the March 25, 1998 notice. *Id.* at 23-24 (*citing* "Withdrawal of Proposed Modification or Revocation of Ruling Letters Relating to Tariff Classification of Bell-Shaped and Similarly Shaped Glassware," 32 Customs Bulletin 12-14 (July 15, 1998)), 28-29.

Pomeroy is similarly correct that none of the merchandise at issue in the ruling letters which were the subject of the notice in the March 25, 1998 Customs Bulletin measured more than five inches tall or more than four inches in diameter. Larger glassware thus was not at issue. *See* Pl.'s Reply Brief at 24, 28; *see also* Def.'s Reply Brief at 4-5 (explaining that the March 25, 1998 Customs Bulletin notice was withdrawn "precisely because the comments received supported a finding that glass vessels of particular shapes that are 5 inches or less in depth and have a top opening of 4 inches or less in diameter are generally of the class or kind that are principally used as candleholders").

Thus, in the case of the four pieces of merchandise in dispute here, the Government's

asserted classifications are based solely on the fact that the glass components of the four pieces are

more than five inches tall or have top openings more than four inches in diameter.

## II.  **Standard of Review**

Under USCIT Rule 56, summary judgment is appropriate where "there is no genuine issue

as to any material fact and . . . the moving party is entitled to . . . judgment as a matter of law."

---

As Pomeroy puts it:

> At no time was there a question of comparison of [the articles at issue in the subject
> ruling letters] to larger articles, as larger articles were not involved in the rulings
> sought to be modified or revoked.  Any discussion of larger articles would have been
> . . . *obiter dictum*, had the ruling been a court decision, as larger articles simply were
> not involved in the determination to be made.  While the government states that HQ
> 960499 was issued as a result of . . . [the March 25, 1998 Customs Bulletin] notice
> and the responses thereto, any response to that notice which dealt in merchandise
> having a diameter larger than 4 inches or a depth of more than 5 inches would have
> had nothing to do with the question at hand regarding the rulings noted . . . and
> would not have been determinative of the questions presented by . . . [the March 25,
> 1998] notice.  The only actual determinations to be made were as to the use of the
> smaller articles.  Any larger articles were simply not in question.

Pl.'s Reply Brief at 24-25.  *See also id.* at 2 (asserting that "none of the rulings proposed to be
modified in the [March 25, 1998 Customs Bulletin] notice . . . measured over 4 inches in width, or
over 5 inches in depth to begin with, so it is difficult to see how commentary regarding the proposed
[modifications and revocations] . . . would have resulted in the issuance of HQ 960499, or any other
ruling dealing with goods in excess of those measurements").

It is also worth noting that, although Customs characterizes the analysis conducted by the
agency as a result of the March 25, 1998 Customs Bulletin notice as an "exhaustive[] review[]" (*see*,
*e.g.*, HQ 960499), the agency actually received only six comments in response to the notice.  *See*
"Withdrawal of Proposed Modification or Revocation of Ruling Letters Relating to Tariff
Classification of Bell-Shaped and Similarly Shaped Glassware," 32 Customs Bulletin at 13 (July 15,
1998); Pl.'s Reply Brief at 21.

USCIT R. 56(c).

Customs' classification decisions are reviewed through a two-step analysis – first construing the relevant tariff headings, then determining under which of those headings the merchandise at issue is properly classified. Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1364-65 (Fed. Cir. 1998) (citation omitted).

Interpretation of the relevant tariff headings is a question of law, while application of the terms to the merchandise is a question of fact. *See id.* Summary judgment is thus appropriate where – as here – the nature of the merchandise is not in question, and the sole issue is its proper classification. *See* Bausch & Lomb, 148 F.3d at 1365 (citation omitted) (explaining that summary judgment is appropriate in customs classification cases "when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is").

In the case at bar, although the parties argue for classification under different headings of the HTSUS, there are no genuine disputes of material fact. The parties are in agreement as to "exactly what the merchandise is"; the sole question is the legal issue of the proper classification of the merchandise.[11] This matter is therefore ripe for summary judgment.

---

[11]The parties bicker over the extent to which Customs' classifications of the merchandise here at issue are entitled to a statutory presumption of correctness. *See* Pl.'s Brief at 6, 7-8, 9-10; Def.'s Brief at 5-6, 7-8, 9, 13-14; 28 U.S.C. § 2639(a)(1). What both parties generally fail to recognize is that the presumption of correctness is irrelevant at the summary judgment stage, where – by definition – there is assertedly no dispute as to any material fact. *See*, *e.g.*, Goodman Mfg., L.P. v. United States, 69 F.3d 505, 508 (Fed. Cir. 1995) (holding that, "[b]ecause there was no factual dispute between the parties, the presumption of correctness is not relevant"); *see generally* Universal Elec., Inc. v. United States, 112 F.3d 488, 491-93 (Fed. Cir. 1997); Rollerblade, Inc. v. United States, 112 F.3d 481, 483-84 (Fed. Cir. 1997).

### III. Analysis

The proper tariff classification of all merchandise imported into the United States is governed by the General Rules of Interpretation ("GRIs"). The GRIs provide a framework for classification under the HTSUS, and are to be applied in sequential order. *See*, *e.g.*, North Am. Processing Co. v. United States, 236 F.3d 695, 698 (Fed. Cir. 2001); Orlando Food Corp. v. United States, 140 F.3d 1437, 1439-40 (Fed. Cir. 1998). As detailed below, the four pieces of merchandise here in dispute are properly classified under HTSUS subheading 9405.50.40 through the straightforward application of GRI 1 and GRI 2(a). Resort to subsequent GRIs – including GRI 3(b) and its "essential character" analysis – is therefore unnecessary. Application of Additional U.S. Rule of Interpretation ("ARI") 1(a) is similarly improper, under the circumstances of this case.

A. Classification Under Heading 9405 by Application of GRI 1 and GRI 2(a)

GRI 1 provides for classification "according to *the terms of the headings* and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following [GRIs 2 through 6]." GRI 1 (emphasis added). Thus, the first step in any classification analysis is to determine whether the headings and notes require a particular classification.

For reasons explained in greater detail below, if merchandise is properly classifiable under HTSUS heading 9405, it cannot be classified under heading 7013. The classification analysis therefore begins with heading 9405.

By its terms, heading 9405 covers "[l]amps and lighting fittings. . . and parts thereof, not elsewhere specified or included." *See* Heading 9405, HTSUS. Explanatory Note 94.05 defines

"[l]amps and lighting fittings" expansively, to include items that are "constituted of any material" (other than "those materials described in Note 1 to Chapter 71," a caveat not relevant here), and that "use any source of light" including, *inter alia*, "candles."  *See* World Customs Organization, Harmonized Commodity Description and Coding System: Explanatory Note 94.05 (2d ed. 1996).[12] Indeed, the Explanatory Note further specifies that heading 9405 "covers in particular . . . [c]andelabra" and "candlesticks," in addition to "candle brackets" (such as those used on pianos). *See id*.  Heading 9405 thus covers not only "[*e*]*lectrical lamps* and lighting fittings," but also lamps and lighting fittings of other types – including "[*n*]*on-electrical lamps* and lighting fittings," such as candle holders and candle lamps.  *See* Explanatory Note 94.05 (emphasis added); Subheading 9405.50, HTSUS (emphasis added); Def.'s Brief at 10 (noting that heading 9405 covers "candle holders").

GRI 2(a) provides, in relevant part:

Any reference in a heading to an article shall be taken to include a reference to that article *incomplete* . . . , provided that, as entered, the incomplete . . . article has the

---

[12]The Explanatory Notes ("ENs") function as an interpretative supplement to the HTSUS, and are "generally indicative of . . . [its] proper interpretation." Lynteq, Inc. v. United States, 976 F.2d 693, 699 (Fed. Cir. 1992) (*quoting* H.R. Conf. Rep. No. 100-576, 100th Cong., 2d Sess. 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582).  They are the official interpretation of the scope of the Harmonized Commodity Description and Coding System (which served as the basis of the HTSUS) as viewed by the Customs Cooperation Council (now known as the World Customs Organization), the international institution that drafted the international nomenclature.  Thus, while the Explanatory Notes "do not constitute controlling legislative history," they "nonetheless are intended to clarify the scope of HTSUS [provisions] and offer guidance in interpreting [those provisions]." Mita Copystar Am., Inc. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (*citing* Lynteq, 976 F.2d at 699).  *See also* Len-Ron Mfg. Co. v. United States, 334 F.3d 1304, 1309 (Fed. Cir. 2003); Rollerblade, Inc., 112 F.3d at 486 n.3.

All citations herein are to the second edition of the Explanatory Notes, published in 1996.

essential character of the complete . . . article. It shall also include a reference to that
article complete . . . , entered *unassembled or disassembled*.

GRI 2(a) (emphases added). Pursuant to GRI 2(a), then, the merchandise classifiable under heading

9405 includes not only complete, fully-assembled candle lamps, but also (1) "incomplete" candle

lamps (provided that, as entered, any "incomplete" candle lamp has the essential character of a

complete candle lamp), as well as (2) complete candle lamps that are entered in an "unassembled

or disassembled" condition.

As described in section I.A above, one of the items still in dispute – the Geo Table Lighting

– is a complete candle lamp within the scope of heading 9405 (as set forth in the Explanatory Note),

which was entered in an "unassembled or disassembled" condition. *See* Pl.'s Exh. 2 (sample of Geo

Table Lighting, in box).[13] As depicted on the box in which the merchandise is imported and sold,

_____

[13]According to the relevant Explanatory Notes, for purposes of GRI 2(a), "'articles presented unassembled or disassembled' means articles the components of which are to be assembled either by means of fixing devices (screws, nuts, bolts, etc.) or by riveting or welding, for example, provided only assembly operations are involved." *See* Explanatory Note 2(a)(VII).

That is not to say that assembly of an imported article *must* involve "fixing devices (screws, nuts, bolts, etc.) or . . . riveting or welding" to fall within the definition of an "unassembled or disassembled" article for purposes of GRI 2(a). Articles involving even simpler assembly are also covered. *See*, *e.g.*, HQ 965440 (Aug. 7, 2002) (ruling that "Swiffer Wet Jet" (a manual floor mop with an internal, hand-operated sprayer, used to wet-mop hard surface floors), which is imported unassembled in three basic pieces that "snap together for ease of assembly by the ultimate consumer," is properly classified under heading 8509 "at [the level of] GRI 1 and GRI 2(a) (because the Wet Jet is imported unassembled)"). Indeed, the Explanatory Notes themselves state that "[n]o account is to be taken . . . of the complexity of the assembly method." *See* Explanatory Note 2(a)(VII).

In contrast, as the Explanatory Notes make clear, the reference in GRI 2(a) to "articles presented unassembled or disassembled" does not cover merchandise which requires more than mere assembly. Specifically, merchandise is not "unassembled or disassembled" for purposes of GRI 2(a) if the components must "be subjected to any further working operation for completion into the finished state." *See* Explanatory Note 2(a)(VII); *see also*, *e.g.*, HQ 960165 (Sept. 18, 1997) (ruling

assembly is a very simple matter: The sand is poured into the bottom of the glass vessel, the candle is positioned on top of the sand, the stones are arranged around the base of the candle, the glass vessel is inserted into the "cradle," and the "cradle" is hung from the hook on the top of the stand. Thus assembled, the Geo Table Lighting falls squarely within the broad description of "[n]on-electrical lamps" set forth in the Explanatory Note to heading 9405. That description expressly includes lamps that use candles as a light source. *See* Subheading 9405.50, HTSUS (emphasis added) (covering "[n]on-electrical lamps and lighting fittings"); Explanatory Note 94.05.

Like the Geo Table Lighting, the other three pieces of merchandise still at issue – the St. Tropez CLS, the St. Tropez Cardinal Bowl, and the Serenity Votives – are also candle lamps within the scope of heading 9405, which were entered in an "unassembled or disassembled" condition and require some simple assembly. *See* Pl.'s Exh. 3 (sample of St. Tropez CLS, in box); Pl.'s Exh. 4 (sample of Serenity Votives, in box); section I.B, *supra* (describing St. Tropez Cardinal Bowl by comparison to St. Tropez CLS, and explaining how all three items are assembled). When assembled as depicted on the boxes in which the merchandise is sold, each of the three items clearly falls within the broad description of "[n]on-electrical lamps" set forth in the Explanatory Note to heading 9405, which expressly includes lamps that use candles as a light source. *See* Subheading 9405.50, HTSUS

---

that Lindal Cedar Homes "home packages" are not "unassembled" prefabricated buildings classifiable under heading 9406, because some components require, *inter alia*, "trimming" and "field cuts" – more than the "assembly operations" contemplated by GRI 2(a)).

The Explanatory Notes further observe that, when merchandise is presented "unassembled or disassembled," "it is usually for reasons such as requirements or convenience of packing, handling or transport." *See* Explanatory Note 2(a)(V). That is obviously the case here, where part of the merchandise is fragile glass.

(emphasis added) (covering "[n]on-electrical lamps and lighting fittings"); Explanatory Note 94.05.

Further, although the St. Tropez CLS, the St. Tropez Cardinal Bowl, and the Serenity Votives were "incomplete" as imported, all three pieces of merchandise had the "essential character" of the *complete* candle lamps, as contemplated by GRI 2(a). Indeed, to "complete" the incomplete lamps, users "just add water."[14]

_____

[14]Both GRI 2(a) and GRI 3(b) employ the term "essential character," but in rather different contexts. As explained above, GRI 2(a) provides that "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete . . . , provided that, as entered, the incomplete . . . article has *the essential character of the complete . . . article*." GRI 2(a) (emphasis added). In contrast, GRI 3(b) provides, in relevant part, that mixtures, composite goods, and sets "which cannot be classified by reference to 3(a), shall be classified as if they consisted of *the material or component which gives them their essential character*." GRI 3(b) (emphasis added). Further, while the Explanatory Notes to GRI 3(b) elaborate on the concept of "essential character" as used in GRI 3(b), the Explanatory Notes to GRI 2(a) are silent. *See* Explanatory Note GRI 3(b)(VIII). Moreover, there is relatively little caselaw concerning the concept of "essential character" for purposes of GRI 2(a). But the paucity of guidance gives no pause here. By any measure, the "incomplete" merchandise at issue in this action had the "essential character" of "complete" merchandise.

Even the incomplete candle lamps, as imported, were capable of providing illumination by candle light, and thus had the "essential character" of complete candle lamps. *See*, *e.g.*, Filmtec Corp. v. United States, 27 CIT 1730, 1736, 293 F. Supp. 2d 1364, 1369 (2003) (holding that, for purposes of GRI 2(a) "essential character" analysis, incomplete merchandise as imported "does not have the essential character of 'the complete or finished article' – the ability to strain salt from water," and thus cannot be classified as straining cloth); Sharp Microelecs. Tech., Inc. v. United States, 20 CIT 793, 800-01, 932 F. Supp. 1499, 1504-05 (1996), *aff'd*, 122 F.3d 1446 (Fed. Cir. 1997) (holding that, for purposes of GRI 2(a) "essential character" analysis, "it is the ability to process data that gives the essential character to articles under [a tariff provision covering "[a]utomatic data processing machines and units thereof"]"). Similarly, if the test for "essential character" under GRI 2(a) is whether the identity of the complete article to be made from the incomplete imported goods is "fixed and certain" at the time of importation, the incomplete candle lamps here had the "essential character" of complete candle lamps. *See*, *e.g.*, Baxter Healthcare Corp. v. United States, 22 CIT 82, 97, 998 F. Supp. 1133, 1145 (1998), *aff'd*, 182 F.3d 1333 (Fed. Cir. 1999) (noting that, in conducting GRI 2(a) "essential character" analysis of textiles, Customs evaluates whether "the identity[] of the article to be made from the imported goods is . . . fixed . . . [and] certain") (citation omitted).

Moreover, the candle lamps at issue are "not elsewhere specified or included," in the words of heading 9405. The classification urged by the Government – heading 7013, covering "[g]lassware of a kind used for . . . indoor decoration or similar purposes" – does not describe Pomeroy's merchandise, which is not "glassware" *per se* (such as a vase), but is instead goods ready for assembly that have, *inter alia*, a *component* made of glass. Nor does any other heading of Chapter 70 ("Glass and Glassware"), or, for that matter, any other heading of the HTSUS, describe the *lamps* which are at issue here.

In sum, pursuant to GRI 1 and GRI 2(a), all four pieces of merchandise remaining at issue in this action – the Geo Table Lighting, the St. Tropez CLS, the St. Tropez Cardinal Bowl, and the Serenity Votives – are properly classifiable as "[l]amps and lighting fittings . . . not elsewhere specified or included," under heading 9405. There is no need to reach any subsequent GRI.

Pursuant to Explanatory Note 70.13, "[l]amps and lighting fittings and parts thereof of heading 94.05" are expressly excluded from classification as "[g]lassware of a kind used for . . . indoor decoration" under heading 7013. *See* Explanatory Note 70.13; *see also* Note 1(e) to Chapter 70.[15] Accordingly, because the Geo Table Lighting, the St. Tropez CLS, the St. Tropez Cardinal

_____

[15]The parties focus their attention not on Explanatory Note 70.13, but – rather – on Note 1(e) to Chapter 70. According to the parties, if the four pieces of merchandise here at issue are properly classifiable under heading 9405, their classification under heading 7013 is barred as a matter of law by Chapter Note 1(e), which provides, in relevant part:

1.        This chapter does not cover:

          . . . .

          (e)        *Lamps or lighting fittings*, illuminated signs, illuminated name-plates
                     or the like, having a permanently fixed light source, or parts thereof

Bowl, and the Serenity Votives  are classifiable as "[l]amps and lighting fittings" under heading

9405, they cannot be classified under heading 7013.

---

        of heading 9405;

Note 1(e) to Chapter 70 (emphasis added); *see* Def.'s Brief at 7 n.5; Pl.'s Reply Brief at 3, 7.  Unlike Explanatory Notes (which are persuasive, but not binding), Chapter Notes are mandatory and conclusive statutory law for all purposes.  *See*, *e.g.*, Degussa Corp. v. United States, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (noting that "chapter notes are integral parts of the HTSUS, and have the same legal force as the text of the headings," in contrast to "[e]xplanatory notes," which "are not legally binding but may be consulted for guidance and are generally indicative of the proper interpretation of a tariff provision") (citation omitted); Libas, Ltd., 193 F.3d at 1364 (describing chapter notes as "statutory language" of the HTSUS).

        As a matter of syntax, Note 1(e) to Chapter 70 is somewhat ambiguous.  In particular, the phrase "having a permanently fixed light source" can fairly be read to modify "[l]amps or lighting fittings," as well as "illuminated signs" and "illuminated name-plates or the like."  *See* Note 1(e) to Chapter 70.  If that reading is correct, then – because the merchandise here at issue does not feature a "permanently fixed light source" – Chapter Note 1(e) would not preclude the *prima facie* classification of that merchandise here under heading 7013, even if the merchandise is also *prima facie* classifiable under heading 9405 (although giving force to Explanatory Note 70.13 still would have that effect).

        There is an alternative – and, frankly, better – reading of Chapter Note 1(e), to which the parties  subscribe.  That reading draws support from the language of heading 9405 itself, where it is clear (from the punctuation of the heading) that the phrase "having a permanently fixed light source" modifies only "illuminated signs" and "illuminated nameplates and the like," and *does not* modify "[l]amps and lighting fittings."  *See* Heading 9405, HTSUS.  If that reading is correct, then – as the parties contend – if the four pieces of merchandise at issue are *prima facie* classifiable under heading 9405, Chapter Note 1(e) absolutely prohibits the classification of that merchandise under heading 7013, as a matter of statutory law.

        In any event, as discussed above, quite apart from Note 1(e) to Chapter 70, giving force to Explanatory Note 70.13 as an expression of the intent of the drafters precludes the classification of the merchandise at issue under heading 7013, if that merchandise is *prima facie* classifiable under heading 9405.

B.  The Government's Arguments

The Government asserts that "Customs' classification of these goods is based upon a long line of rulings, exemplified by HQ 960499," as outlined in section I.E above.  *See* Def.'s Brief at 6 & n.4.  Relying on HQ 960499 and other similar ruling letters, the Government advances two main arguments.

The Government first maintains that each of the four pieces of merchandise still at issue – the Geo Table Lighting, the St. Tropez CLS, the St. Tropez Cardinal Bowl, and the Serenity Votives – must be classified based on its "essential character," pursuant to GRI 3(b); and, according to the Government, it is the glass vessel(s) that impart the essential character to each piece.  *See generally* Def.'s Brief at 4, 6, 10; Def.'s Reply Brief at 2-3.

Second, the Government contends that the two competing headings – heading 7013 and heading 9405 – are both "principal use" provisions, and thus implicate Additional U.S. Rule of Interpretation ("ARI") 1(a), which provides for classification in accordance with the use of merchandise "of that class or kind to which the imported goods belong."  *See* ARI 1(a); *see also* Def.'s Brief at 4, 6, 10; Def.'s Reply Brief at 4 n.4.  According to the Government, Customs has properly determined that glass vessels of certain specific shapes and sizes are "of the class or kind of articles that are principally used as candle holders" (and are thus classifiable under HTSUS heading 9405), while larger glass vessels "are used for more varied purposes and thus are properly classified as decorative glassware of a kind used for indoor decoration or similar purposes in subheading 7013.99, HTSUS."  *See* Def.'s Brief at 6-7; section I.E, *supra*; *see generally* Def.'s Brief at 8, 11-13, 15-16; Def.'s Reply Brief at 1-2, 3-7 & n.7.

As discussed below, however, the Government's arguments are lacking in merit.[16]

_____

[16]The Government urges the Court to accord <u>Chevron</u> deference to Customs' position (as articulated in the July 15, 1998 Customs Bulletin notice) that "glass vessels of certain shapes and less than 5 inches in height and 4 inches in diameter at the top opening are of the class or kind of articles that are principally used to hold candles, while glassware having these shapes but which exceed these dimensions . . . have more varied uses." *See* Def.'s Brief at 8 (*citing* <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984)); "Withdrawal of Proposed Modification or Revocation of Ruling Letters Relating to Tariff Classification of Bell-Shaped and Similarly Shaped Glassware," 32 Customs Bulletin 12-14 (July 15, 1998).

As Pomeroy notes, however, Customs' classification rulings generally are not entitled to <u>Chevron</u> deference. *See* Pl.'s Reply Brief at 27 (*citing* <u>United States v. Mead Corp.</u>, 533 U.S. 218, 234 (2001)). The Government counters that the agency position at issue "was developed as the result of public comments that were received in connection with . . . [the March 25, 1998 Customs Bulletin notice] concerning the proposed change in the tariff classification of glassware from heading 9405 to heading 7013." *See* Def.'s Brief at 8-9. Thus, the Government contends, "it represents the type of agency position that was intended to be given deference, in accordance with <u>Chevron</u>." *Id*.

The Government greatly overstates the case for <u>Chevron</u> deference. The administrative process that led to the development of Customs' position, as articulated in the July 15, 1998 Customs Bulletin notice, bore little resemblance to the formal "notice-and-comment" rulemaking procedures that are generally the hallmark of agency determinations entitled to <u>Chevron</u> deference. *See* Pl.'s Reply Brief at 28-29 (discussing unusual procedural context of agency's development of size criteria). Moreover, the size criteria set forth in the July 15, 1998 Customs Bulletin notice reflect only six public comments, which Pomeroy dismisses as "hardly the basis for 'an exhaustive review' of principal use, even if a number of advertisements were included in those six responses." *Id*. at 21. Further, none of the merchandise at issue in the rulings which were the subject of the Customs Bulletin notice included candles, or otherwise closely resembled the merchandise at issue in this action. In short, among other things, it is far from clear that all potentially interested parties had proper and sufficient advance notice of (and timely opportunity to comment on) the position that Customs ultimately took, particularly as to merchandise of the type at issue in this action.

In the alternative, the Government asserts that, "[i]f not afforded <u>Chevron</u> deference, at a minimum, . . . [Customs'] position should be granted [<u>Skidmore</u>] deference, on the ground that it is reasonable and persuasive." *See* Def.'s Brief at 9 (*citing* <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944)); *see also* Def.'s Reply Brief at 5-7 (asserting entitlement to deference). *But see* Pl.'s Reply Brief at 26-30 (arguing against deference); *see also id*. at 23-25 (same).

As the Court of Appeals has explained, "Under <u>Skidmore</u>, a classification ruling receives a

## 1.  The Government's GRI 3(b) Argument

The Government insists that GRI 3(b) mandates that each of the four pieces of merchandise still in dispute be classified based on its "essential character."  Asserting further that it is the glass vessel(s) that impart the essential character to each of those four pieces of merchandise, the Government concludes that all four are properly classifiable as "[g]lassware of a kind used for table, kitchen, toilet, office, indoor decoration or similar purposes . . . ," under heading 7013 of the HTSUS.  *See generally* Def.'s Brief at 4, 6, 9-10; Def.'s Reply Brief at 2-3; Heading 7013, HTSUS.

GRI 3 provides, in relevant part:

> When, by application of rule 2(b) [which provides for the classification of "goods consisting of more than one material or substance . . . according to the principles of Rule 3"] or for any other reason, goods are, *prima facie*, classifiable under two or more headings, classification shall be effected as follows:
>
> (a)      The heading which provides the most specific description shall be

---

measure of deference proportional to its 'power to persuade.'"  Mead Corp. v. United States, 283 F.3d 1342, 1346 (Fed. Cir. 2002) (*quoting* Skidmore, 323 U.S. at 140).  In this case, however, there is no need to decide the extent of any deference that might otherwise be warranted, because – for reasons detailed more fully elsewhere herein – Customs' size criteria have no application here.

As noted above, for example, none of the merchandise at issue in the rulings which were the subject of the July 15, 1998 Customs Bulletin notice or in the six Customs ruling letters cited by the Government included candles or was otherwise similar to the merchandise in dispute here.  It is true that, over the years, in cases that the Government *does not* cite, Customs has sought to extend the reach of its position, applying its size criteria in a limited number of ruling letters to merchandise that does include candles.  *See*, *e.g.*, HQ 961866.  But research has disclosed no formal agency ruling letter where Customs has applied its size criteria to merchandise remotely comparable to that at issue here – that is, merchandise which is both imported with candles, and which is so obviously designed, configured, packaged, labeled, marketed, merchandised, advertised, and sold solely and exclusively for use as "candle lamps" or "candle holders."  In short, there is no need to reach the question of Skidmore deference here, because the Customs "position" for which the Government seeks deference does not control this case.

> preferred to headings providing a more general description . . . .

> (b)    Mixtures, composite goods consisting of different materials or made up of different components, and goods put up in sets for retail sale, which cannot be classified by reference to 3(a), shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable.

GRI 3.

Contrary to the Government's claims, GRI 3 has no application here. By its terms, GRI 3 applies only where "goods are, *prima facie*, classifiable under two or more headings." *See* GRI 3. As set forth in section III.A above, however, the four pieces of merchandise in dispute are properly *prima facie* classifiable under heading 9405, pursuant to GRI 1 and GRI 2(a). And Explanatory Note 70.13 expressly excludes from classification under heading 7013 "[l]amps and lighting fittings and parts thereof of heading 94.05." *See* Explanatory Note 70.13; *see also* Note 1(e) to Chapter 70.[17] There is therefore no basis for invoking GRI 3, because the merchandise at issue is not "*prima facie*, classifiable under two or more headings." *See*, *e.g.*, Midwest of Cannon Falls, Inc. v. United States, 122 F.3d 1423, 1429 (Fed. Cir. 1997) (holding that chapter note which excludes articles of heading 9505 from classification under chapter 69 "obviates . . . [the] need to decide whether the items . . . *prima facie* fall under the alternative headings 6912 . . . and 6913").[18]

_____

[17]*See* n.15, *supra* (discussing effect of Note 1(e) to Chapter 70).

[18]As the Court of Appeals explained in Midwest of Cannon Falls, under circumstances analogous to those here:

> Note 2(ij) to chapter 69 states that the chapter does not cover "Articles of chapter 95." Accordingly, the issue here is whether the items at issue *prima facie* are classifiable under heading 9505. If so, then pursuant to note 2(ij), chapter 69, the items cannot fall under chapter 69 and must be classified under chapter 95.

The Government emphasizes that, in addition to one or more glass vessels, each of the four pieces of merchandise incorporates "other items/components (gems, stones, etc.)" (*see* Def.'s Reply Brief at 2), and contends that each of the four pieces is therefore a "set" or a "composite good" subject to classification under GRI 3(b). *See generally* Def.'s Brief at 9-10; Def.'s Reply Brief at 2.

However, contrary to the Government's implication, the mere fact that a piece of merchandise consists of more than one item or article does not necessarily make that merchandise a "set" or a "composite good" subject to classification under GRI 3(b).[19]  GRI 3(b) applies only if "no provision exists in the Harmonized System that provides for the set [or composite good] *as a whole*."  U.S. Customs and Border Protection, "What Every Member of the Trade Community Should Know About Tariff Classification" at 19 (May 2004) (emphasis added) (illustrating application of GRI 3(b) through, *inter alia*, "Composite Good Example" and "Set Example").  That is not this case.

Here, as discussed in section III.A above, there *is* a tariff provision "that provides for the set

Midwest of Cannon Falls, 122 F.3d at 1429.

[19]The fact that the four pieces of merchandise each consist of "other items/components" in addition to glassware is the linchpin of the Government's argument that classification under heading 9405 requires a GRI 3(b) analysis, and thus a determination as to the "essential character" of each of the four pieces of merchandise.

However, as Pomeroy pointedly notes, "[f]or purposes of classification under Heading 9405, it does not matter whether or not [the four pieces of merchandise] are composed of more than one material, as the Explanatory Notes clearly state that [merchandise classifiable under heading 9405] may be composed of any material."  *See* Pl.'s Reply Brief at 4-5.  Pomeroy continues: "Under Heading 9405, there is no question of essential character according to material.  Material is not a consideration of classification under that heading, and it is of no import whether the articles consist of glass, metal, plastic or other components."  *Id*. at 5.

[or composite good] as a whole" – specifically, HTSUS heading 9405, which broadly covers "[l]amps and lighting fittings." *See* Heading 9405, HTSUS. To the extent that elements such as faux gems, stones, and sand serve a decorative function – rather than (or in addition to) helping to anchor and stabilize the light source (*i.e.*, the candles) – their presence in no way precludes classification of the four pieces of merchandise at issue under heading 9405. Even common household table lamps classifiable under heading 9405 as "[l]amps and lighting fittings" are often both functional and ornamental, serving as illumination but incorporating decorative elements as well.[20]

---

[20]Chandeliers typically have many decorative crystals hanging separate and apart from the main lighting fixture, for ornamental purposes. Yet chandeliers (ornamental crystals and all) are expressly included within the scope of heading 9405. *See* Subheading 9405.10, HTSUS (covering "Chandeliers and other electric ceiling or wall lighting fittings," with narrow exceptions not relevant here). Similarly, the Government has here stipulated to the classification of the Calder Mini Table Bowl under heading 9405, even though that merchandise consists of not only an iron stand and a glass vessel, but also a packet of either stones or faux glass "gems," as well as a vanilla-scented floating candle. *See* Pl.'s Exh. 5 (sample of Calder Mini Table Bowl, in box); n.6, *supra* (describing Calder Mini Table Bowl). *See also*, *e.g.*, The Home Depot, U.S.A., Inc. v. United States, 30 CIT ____, ____ and *passim*, 427 F. Supp. 2d 1278, 1305 and *passim* (2006), *aff'd*, 491 F.3d 1334 (Fed. Cir. 2007) (where parties stipulated to classification under heading 9405 and only dispute was as to proper subheading, court analyzed numerous lighting fixtures, and expressly took note of decorative, ornamental, and stylistic elements of each fixture, such as "a stylized decorative dome shade" that "contributes to the decorative appearance" of the fixture and "defines [the] fixture from design and marketability standpoints").

An automobile's tariff classification does not differ depending on whether it is a stripped-down model designed solely as basic transportation or a high-end luxury sedan supplied with every conceivable option and amenity. *See* Heading 8703, HTSUS (covering "Motor cars and other motor vehicles principally designed for the transport of persons . . . , including station wagons and racing cars"). Just as a "motor vehicle" is a "motor vehicle," so too a "lamp" is a "lamp," no matter how simple or elaborate it may be. Nothing limits classification under heading 9405 to merchandise consisting of only that which is absolutely integral and indispensable to the function of illumination.

Similarly, the fact that faux gems, stones, and sand (even candles) would be classifiable

In any event, even assuming, *arguendo*, that the four pieces of merchandise at issue were "*prima facie*, classifiable under two or more headings" (*i.e.*, heading 9405 and heading 7013),[21] the merchandise would nevertheless be properly classified under heading 9405, pursuant to GRI 3(a) – the rule of "relative specificity." As outlined above, GRI 3(a) requires that – where merchandise is *prima facie*, classifiable under two or more headings – "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description." *See* GRI 3(a). As the Explanatory Notes emphasize, only if merchandise cannot be classified pursuant to GRI

---

under tariff provisions other than heading 9405 if imported separately (rather than incorporated into the candle lamps at issue here) is of no moment. As Pomeroy aptly observes:

> An automobile . . . is comprised of a myriad of different materials, including steel, plastics, glass, fabrics, mechanical assemblies, engines, tires, etc., all of which contribute to its construction and operation. Notwithstanding that fact, . . . [a tariff classification analysis would give no consideration] to the specific tariff provisions for articles of plastics, articles of iron and steel, articles of glass, textiles, internal combustion engines, or the other possible classifications, whether based upon materials or otherwise, in the face of a tariff provision for "motor cars and motor vehicles" in Headings 8702 and 8703, which do not include restrictions by material designation. The only question to be answered would be whether the item to be classified was a motor vehicle. Similarly, the articles before the court are "candle holders" which are articles conceded by the defendant to be a type of lamp. If they are provided for as "lamps," a provision which does not include a requirement as to material, one need not examine the tariff provisions for each of the components of which they are constructed, any more than one would examine such provisions with the motor vehicle . . . .

Pl.'s Reply Brief at 6-7.

[21]As discussed in section III.A above, however, Explanatory Note 70.13 expressly excludes from classification under heading 7013 "[l]amps and lighting fittings and parts thereof of heading 94.05." *See* Explanatory Note 70.13. Thus, because the four pieces of merchandise in dispute are *prima facie* classifiable under heading 9405, they cannot be classified under heading 7013. *See also* n.15, *supra* (discussing effect of Note 1(e) to Chapter 70).

3(a) does GRI 3(b) come into play.  *See* Explanatory Note GRI 3(b)(VI) (stating that GRI 3(b)

"applies only if Rule 3(a) fails"); Bauer Nike Hockey USA, Inc. v. United States, 393 F.3d 1246,

1252 (Fed. Cir. 2004) (holding that, where the GRI 3(a) "rule of relative specificity" adequately

resolved proper classification of merchandise, Customs erred in reaching GRI 3(b) "essential

character" analysis).

It is clear beyond cavil that heading 9405, which covers "[l]amps and lighting fittings," is

more specific than heading 7013, which covers "[g]lassware of a kind used for table, kitchen, toilet,

office, indoor decoration or similar purposes." *See* Heading 9405, HTSUS; Heading 7013, HTSUS;

Pl.'s Brief at 12; Pl.'s Reply Brief at 7.[22]   The more specific provision is "the provision with

requirements that are more difficult to satisfy and that describe the article with the greatest degree

of accuracy and certainty."  BASF Corp. v. United States, 497 F.3d 1309, 1315 (Fed. Cir. 2007)

(*quoting* Orlando Food Corp., 140 F.3d at 1441).  "Lamps and lighting fittings" may be made of

glass, and thus may also be considered "[g]lassware of a kind used for . . . indoor decoration or

similar purposes."   But "[l]amps and lighting fittings" is a much narrower and more precise

description.  Thus, even assuming that classification of the four pieces of merchandise here at issue

required resort to GRI 3 (which it does not), the four pieces would nevertheless be properly

classified under heading 9405, pursuant to GRI 3(a) (the "rule of relative specificity").  *See*

_____

[22]*Cf*. Bauer Nike Hockey, 393 F.3d at 1252-53 (holding HTSUS provision covering "ice hockey . . . articles and equipment" to be "much more specific" than HTSUS provision "which refers quite broadly to other garments of man-made fibers"); Midwest of Cannon Falls Inc. v. United States, 20 CIT 123, 135 (1996), *aff'd in relevant part and rev'd in part*, 122 F.3d 1423, 1426 n.1 (Fed. Cir. 1997) (holding that, pursuant to GRI 3(a) "relative specificity" analysis, HTSUS provision which covered merchandise when "viewed as a unit" is more specific than provision covering "glassware of a kind used for . . . indoor decoration," which "only describes a portion of the item").

*generally* Pl.'s Reply Brief at 7.[23]   There would be no cause to reach GRI 3(b), on which the

---

[23]As discussed in greater detail below, although the parties agree that heading 7013 is a "principal use" provision, Pomeroy disputes the Government's contention that heading 9405 is also a "principal use" provision. Pomeroy maintains that heading 9405 is instead an *eo nomine* provision. *See* Pl.'s Brief at 4, 6, 12, 17; Pl.'s Reply Brief at 2-3, 31.

A "use" provision is "a provision describing articles by the manner in which they are used as opposed to by name," while an *eo nomine* provision is one "in which an item is identified by name." Len-Ron Mfg. Co., 334 F.3d at 1308.  And there are two types of "use" provisions – "actual use" and "principal (formerly known as "chief") use."  An "actual use" provision is satisfied only if "such use is intended at the time of importation, the goods are so used and proof thereof is furnished within 3 years after the date the goods are entered."  *See* Additional U.S. Rule of Interpretation ("ARI") 1(b) (*quoted in* Clarendon Mktg., Inc. v. United States, 144 F.3d 1464, 1467 (Fed. Cir. 1998)).  In contrast, a "principal use" provision functions essentially "as a controlling legal label, in the sense that even if a particular import is proven to be actually used inconsistently with its principal use, the import is nevertheless classified according to its principal use." Clarendon Mktg., 144 F.3d at 1467.

For purposes of GRI 3(a), "principal use" provisions are generally deemed to be more specific than *eo nomine* provisions.  However, that principle is not an ironclad rule of law, but merely a "convenient rule of thumb for resolving issues where competing provisions are *in balance*." Len-Ron Mfg. Co., 334 F.3d at 1313 (emphasis added) (citation omitted); *see also* BASF Corp., 497 F.3d at 1315 (same); Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1380-81 (Fed. Cir. 1999) (explaining that the "general rule" that a principal use provision is typically more specific than an *eo nomine* provision is "not obligatory"); Orlando Food Corp., 140 F.3d at 1441 (stating that "[r]esort to this aid to statutory construction [that use provisions are generally deemed more specific than *eo nomine* provisions] is not obligatory, however, as it is merely a 'convenient rule of thumb for resolving issues where the competing provisions are otherwise in balance.'") (*quoting* United States v. Siemens Am., Inc., 653 F.2d 471, 478 n.6 (CCPA 1981)).  The general "rule of thumb" has no application where – as here – one tariff provision (in effect) "specifies a single article for proper classification" and the competing provision "is a broad provision encompassing a variety of articles with specific and independent uses."  Len-Ron Mfg. Co., 334 F.3d at 1313 (citation omitted) (holding *eo nomine* tariff provision covering "vanity cases" to be more specific than tariff provision covering "[a]rticles of a kind normally carried in the pocket or in the handbag").

Accordingly, even assuming that it were necessary to reach GRI 3 in this case (which, as discussed above, it is not), and even assuming that heading 9405 is an *eo nomine* provision (*see* section III.B.2, *infra*), a GRI 3(a) "relative specificity" analysis of the two competing headings nevertheless would compel the classification of the four pieces of merchandise at issue under heading 9405, rather than heading 7013.

Government seeks to rely.

Neither HQ 960499 nor any of the five other ruling letters to which the Government makes passing reference does anything to advance the Government's position here. As section I.E above explains, the analysis in most of those rulings begins with – and proceeds from – the assumption that the metal and glass items there at issue are "composite goods" or "sets" subject to classification pursuant to a GRI 3(b) "essential character" analysis. *See* HQ 960499; HQ 960819; HQ 960962; HQ 961095. Those rulings thus "leapfrog" over GRIs 1 and 2(a), which – as detailed above – properly and completely dispose of the classification of the merchandise at issue in *this* matter (particularly in light of Explanatory Note 70.13).[24] *See* section III.A, *supra*. Nor does the analysis in the rulings cited by the Government consider GRI 3(a). Yet, as explained above, even assuming, *arguendo*, that the merchandise here at issue were not classifiable under heading 9405 pursuant to GRI 1 and 2(a) (which it is), heading 9405 would still prevail over heading 7013 under a GRI 3(a) "relative specificity" analysis.

In short, there is simply no reason to reach a GRI 3(b) "essential character" analysis in this case – and a GRI 3(b) "essential character" analysis is the *starting point* in HQ 960499 and most of the other ruling letters on which the Government here relies.

---

[24]As discussed above, Explanatory Note 70.13 expressly excludes from classification under heading 7013 "[l]amps and lighting fittings . . . of heading 94.05." *See* Explanatory Note 70.13; *see also* n.15, *supra* (discussing effect of Note 1(e) to Chapter 70).

## 2. The Government's ARI 1(a) Argument

The Government's argument based on Additional U.S. Rule of Interpretation ("ARI") 1(a) is similarly flawed. The Government contends that the two headings at issue – heading 7013 and heading 9405 – are both "principal use" provisions, and thus implicate ARI 1(a), which provides for classification in accordance with the use of merchandise "of that class or kind to which the imported goods belong." *See* ARI 1(a).[25] Pointing to HQ 960499, the Government asserts that Customs has properly determined that glass vessels of certain specific shapes and sizes are "of the class or kind of articles that are principally used as candle holders" (and are thus classifiable under HTSUS heading 9405), while larger glass vessels "are used for more varied purposes and thus are properly classified as decorative glassware of a kind used for indoor decoration or similar purposes in subheading 7013.99, HTSUS." *See* Def.'s Brief at 6-7; *see generally id*. at 8, 11-13, 15-16; Def.'s Reply Brief at 1-2, 3-7 & n.7.

The Government's reliance on HQ 960499 and ARI 1(a) is misplaced. As a threshold matter, it is entirely unclear that heading 9405 is a "principal use" provision, as the Government insists it is. *See* Def.'s Brief at 4, 6, 10 (claiming that heading 9405 is a "principal use" provision); *but see*

---

[25]Specifically, the Additional U.S. Rules of Interpretation provide, in relevant part:

1.      In the absence of special language or context which otherwise requires –

    (a)     a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the day of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use[.]

ARI 1(a).

Def.'s Reply Brief at 4 n.4 (claiming that *subheading* 9405.50.40 is a "principal use" provision).[26]

Although Customs has repeatedly asserted in various ruling letters that *subheading* 9405.50.40 is a "principal use" provision, the agency has contented itself with conclusory statements to that effect and has proffered no reasoning to support the proposition. *See*, *e.g.*, HQ 960499 (asserting that subheading 9405.50.40 is a "principal use" provision). The Government's briefs in this matter are also conspicuously silent on the point. Nor has the Government identified any authority or advanced any substantial rationale to support its claim that *heading* 9405 – as opposed to some *subheading* thereunder – is a "principal use" provision. Certainly no court has ever held heading 9405 (or, for that matter, even subheading 9405.50.40) to be a "principal use" provision.[27]

Pomeroy makes a compelling argument that heading 9405 is not a "principal use" provision,

---

[26]Significantly, tariff *subheadings* become relevant only if it is determined that merchandise is properly classified under the relevant *heading*. Thus, "[o]nly after determining that a product is classifiable under the heading should the court look to the subheadings to find the correct classification for the merchandise." Len-Ron Mfg. Co., 334 F.3d at 1308-09 (*quoting* Orlando Food Corp., 140 F.3d at 1440).

[27]HTSUS subheading 9405.30.00 – the subheading of heading 9405 covering "lighting sets *of a kind used for* Christmas trees" – was found to be a "principal use" provision in Primal Lite. *See* Subheading 9405.30.00, HTSUS (emphasis added); Primal Lite, Inc. v. United States, 182 F.3d 1362, 1363-64 (Fed. Cir. 1999). However, the language of that particular subheading includes the phrase "of a kind used for . . . ", which typically characterizes "principal use" provisions. *See*, *e.g.*, Len-Ron Mfg. Co., 334 F.3d at 1313 n.7. And that subheading is not at issue in this action. Nothing in Primal Lite supports the Government's claim that heading 9405 (which *does not* include the phrase "of a kind used for . . . ") is a "principal use" provision.

The only other case involving heading 9405 is Home Depot. There, however, the parties stipulated that the merchandise at issue was classifiable under heading 9405; the parties' dispute was as to the proper subheading. *See* Home Depot, 30 CIT at ____, 427 F. Supp. 2d at 1291. As with Primal Lite, nothing in Home Depot supports the notion that heading 9405 is a "principal use" provision.

but is instead an *eo nomine* provision.  *See generally* Pl.'s Brief at 4, 6, 12, 17; Pl.'s Reply Brief at

2-3, 31.  To be sure, unlike heading 7013,[28] neither heading 9405 nor subheading 9405.50.40

includes language such as "of a kind used for . . ." that typically characterizes "principal use"

provisions.  *See*, *e.g.*, Primal Lite, Inc. v. United States, 182 F.3d 1362, 1363 (Fed. Cir. 1999); Len-

Ron Mfg. Co. v. United States, 334 F.3d 1304, 1313 n.7 (Fed. Cir. 2003).[29]

As Pomeroy explains, "[a]n *eo nomine* designation is one which describes a commodity by

a specific name, usually one well known to commerce."  *See* Pl.'s Reply Brief at 3 (*citing* United

States v. Bruchmann, 582 F.2d 622, 625 n.8 (1978)); *see also* Carl Zeiss, Inc. v. United States, 195

F.3d 1375, 1379 (Fed. Cir. 1999).  "Lamps and lighting fittings" is terminology well known to

commerce.  According to Pomeroy, "[i]n providing for lamps and lighting fittings, along with other

articles, such as illuminated signs and illuminated nameplates, all by name, heading 9405 is clearly

identifiable as an *eo nomine* provision."  *See* Pl.'s Reply Brief at 3.  And, as Pomeroy emphasizes,

absent some express restriction, an *eo nomine* designation generally "encompasses all forms of the

named article."  *See* Pl.'s Brief at 12 (citation omitted); Pl.'s Reply Brief at 3 (citation omitted); *see*

*also* JVC Co. of Am. v. United States, 234 F.3d 1348, 1352 (Fed. Cir. 2000).  In the instant case,

the Government has pointed to nothing to suggest that the broad language of heading 9405 (or even

that of subheading 9405.50.40) does not embrace "all forms of the named article."  If heading 9405

---

[28]As discussed above, heading 7013 covers "[g]lassware *of a kind used for* table, kitchen, toilet, office, indoor decoration or similar purposes . . . ."  *See* Heading 7013, HTSUS (emphasis added).

[29]*But see* Stewart-Warner Corp. v. United States, 748 F.2d 663, 667 (Fed. Cir. 1984) (noting that a tariff provision may be a "principal use" provision notwithstanding the absence of the word "use" or the words "chiefly [now, "principally"] used" in the language of the provision).

is indeed an *eo nomine* designation, as Pomeroy persuasively argues, ARI 1(a) has no relevance here.

Even more fundamentally, however, the purpose of ARI 1(a) is to classify imported goods, or imported goods belonging to a class or kind of goods, that have *multiple uses*. But that is not the case here. And the purpose of ARI 1(a) is to classify imported merchandise according to the principal use of such merchandise, even though the specific imported goods in a particular case may be put to some atypical, "fugitive" use. *See* Primal Lite, Inc., 182 F.3d at 1364. Contrary to the Government's assertions, ARI 1(a) plainly does not provide for the classification of imported merchandise according to the principal use of just *a part* of that merchandise.

As illustrated by HQ 960499 and its progeny, the Government's claim that the four pieces of merchandise in dispute are classifiable under heading 7013 is based on what the Government asserts is the principal use of *part only* of the imported goods, or the goods of the class or kind to which they belong. In other words, the Government's "principal use" argument focuses solely on what it asserts is the principal use of only a single part of each of the four pieces of merchandise at issue – *i.e.*, the articles of glass. Specifically, the Government contends – in essence – that, for purposes of ARI 1(a), the "class or kind" of goods to which the merchandise here belongs is determined solely by the glass components of the merchandise, and turns on whether those glass components are more than five inches tall or have top openings greater than four inches in diameter. According to the Government, smaller glassware (*i.e.*, glassware of a size within the specified parameters) is classifiable as "candle holders" under heading 9405, and larger glassware is not. *See*

*generally* HQ 960499; Def.'s Brief at 6-7, 11-13, 15-16; Def.'s Reply Brief at 1-2, 3-7.[30]

Even assuming that ARI 1(a) applied in this case (which it does not), ARI 1(a) would not permit such an analysis here. Instead, ARI 1(a) looks to the principal use of goods of the class or kind to which the imported goods at issue belong, *in the condition in which those goods are imported*. *See* BASF Corp., 497 F.3d at 1314 (referring to "the longstanding rule of tariff law that goods are to be classified according to their condition when imported") (*citing* United States v. Citroen, 223 U.S. 407, 414-15 (1912)); Pl.'s Brief at 14; Pl.'s Reply Brief at 10 (noting that "[t]he government would have classification depend, *not upon the merchandise as imported*, but solely upon the size of a portion of those articles") (emphasis added).[31]

---

[30]According to the Government, "Customs has used the[] size criteria [set forth in the July 15, 1998 Customs Bulletin notice, as well as the ruling letters that the Government cites] as guidelines only, to be applied in the absence of contrary evidence regarding the principal use of the imported merchandise." *See* Def.'s Reply Brief at 6. HQ 960499 at least implicitly recognizes possible exceptions to Customs' size "guidelines," stating that the agency "found there to be a clear distinction between glassware used as candle holders and that used for general indoor decoration based on the size of the articles, *in the absence of other pertinent evidence or information*." *See* HQ 960499 (emphasis added); *see also* "Withdrawal of Proposed Modification or Revocation of Ruling Letters Relating to Tariff Classification of Bell-Shaped and Similarly Shaped Glassware," 32 Customs Bulletin at 13-14 (July 15, 1998) (stating Customs' conclusion that, "in the absence of evidence to the contrary," glass vessels with a height of five inches or less and a top opening with a diameter of four inches or less "are principally used as candle holders").

Independent research, however, has identified no instance in which merchandise larger than Customs' "guidelines" has been classified under heading 9405, pursuant to any such exception. Certainly the Government has identified no such case. Pomeroy emphasizes that "[i]n this case we have other evidence and pertinent information." *See* Pl.'s Reply Brief at 21. "The articles . . . in the instant action were all imported with, merchandised with, and clearly intended to be used with, candles . . . ." *Id.*

[31]The Government concedes that the merchandise at issue may be used for illumination, "at least until the candles with which they are sold are consumed." Def.'s Brief at 14; *see also* Def.'s Reply Brief at 7 (referring to use of the merchandise "until the candles are consumed or discarded").

The Government's "principal use" argument turns a blind eye to the existence of the candles as a light source, and ignores the only possible use for the four pieces of merchandise in dispute *in the condition in which those pieces were imported*, and the class or kind of articles to which they belong. As amply evidenced by the samples (which here serve as particularly "potent witnesses"), the undisputed facts are that the four pieces of merchandise are designed, configured, packaged, labeled, marketed, merchandised, advertised, and sold solely and exclusively for use as candle lamps. *See* Simod Am. Corp. v. United States, 872 F.2d 1572, 1578 (Fed. Cir. 1989) (emphasizing that "the merchandise itself is often a potent witness in classification cases") (citation omitted); Pl.'s Exh. 2 (sample of Geo Table Lighting, in box); Pl.'s Exh. 3 (sample of St. Tropez CLS, in box); Pl.'s Exh. 4 (sample of Serenity Votives, in box); section I.B, *supra* (describing St. Tropez Cardinal Bowl

---

But Customs is not free to simply "assume away" any part of imported merchandise that is subject to classification. Customs is not free to "assume away" the candles (or, for that matter, any of the other components) included as part of the imported merchandise at issue here. *See generally* Pl.'s Reply Brief at 9 (noting that the Government essentially contends that "the purchaser would purchase these articles in order to throw away everything except the glass bowl and the iron stand, so that they could be used for pot pourri or another use") (citation omitted).

By focusing solely and exclusively on the glass vessels included as part of the four pieces of merchandise at issue, and essentially ignoring the candles and other components of that merchandise as imported, the Government's classification analysis runs afoul of the "well settled law that merchandise is classified according to its condition when imported." Mita Copystar, 21 F.3d at 1082 (citation omitted); *see also* Worthington v. Robbins, 139 U.S. 337, 341 (1891) ("[T]he dutiable classification of articles imported must be ascertained by an examination of the imported article itself, in the condition in which it is imported"); Rollerblade, Inc., 112 F.3d at 487 ("An item must be evaluated for tariff purposes in its condition as imported.") (citation omitted); Simod Am. Corp. v. United States, 872 F.2d 1572, 1577 (Fed. Cir. 1989) (emphasizing that "*the principle [that merchandise is dutiable in its condition as imported] is so basic it hardly needs to be mentioned* in any discussion of a classification problem by judges, officials, or lawyers having any serious involvement in such matters") (emphasis added).

by comparison to St. Tropez CLS); Pomeroy Affidavit ¶¶ 4-6.[32]  The Government conspicuously

fails to identify even a single possible use for the instant merchandise – in the condition in which

it is imported – or the class or kind of merchandise to which it belongs, other than as candle lamps.

Even if ARI 1(a) were to apply in this case (and, again, it does not), the relevant class or kind

of goods would consist of *candle lamps* (or candle holders) – not some broad, vague, arbitrary class

of various goods made *in part* of glass, of some particular size and shape, as the Government claims.

_____

[32]Pomeroy's Chief Operating Officer has attested that he himself designed the four pieces of merchandise at issue, as well as the picture boxes in which those four pieces of merchandise are sold.  *See* Pomeroy Affidavit ¶¶ 3-4.  He has further attested that each of the four pieces is designed to "function . . . as a candle holder," and that the packaging is designed "to clearly identify for the purchaser the intended use of each article as a candle holder."  *See* Pomeroy Affidavit ¶ 4.  As discussed in section I above, each of the four boxes includes large, attractive, color photographs of the merchandise in question, fully assembled and *in use as a candle lamp*, on multiple sides of the box.  *See* Pl.'s Exh. 2 (photo box, containing sample of Geo Table Lighting); Pl.'s Exh. 3 (photo box, containing sample of St. Tropez CLS); Pl.'s Exh. 4 (photo box, containing sample of Serenity Votives); section I.B, *supra* (describing St. Tropez Cardinal Bowl by comparison to St. Tropez CLS).  No other use of the merchandise (or, for that matter, any part of the merchandise) is even alluded to, much less depicted, on the packaging.

In addition, Pomeroy's Chief Operating Officer has attested that all four pieces of merchandise in dispute are in fact sold as candle holders.  *See* Pomeroy Affidavit ¶¶ 5-6.  Thus, for example, the Geo Table Lighting is listed in Pomeroy's literature under the caption "Pillar Holders"; and the St. Tropez CLS, St. Tropez Cardinal Bowl, and Serenity Votives are listed under the caption "Floating Candle Holders."  *See* Pomeroy Affidavit ¶ 5; Pl.'s Exh. 6 (Pomeroy Price List).  Further, each of the boxes in which the four pieces of merchandise are sold includes not only the name of the particular piece of merchandise inside (*i.e.*, "Geo Table Lighting," "St. Tropez CandlePot," "Serenity Glass Votive Trio," etc. – all of which are names evocative of candlelight, or at least "lighting"), but also prominent references to "San Miguel *Candle Lamps*" (emphasis added) and to the fact that candles are included with the merchandise.  *See* Pl.'s Exh. 2 (photo box, containing sample of Geo Table Lighting); Pl.'s Exh. 3 (photo box, containing sample of St. Tropez CLS); Pl.'s Exh. 4 (photo box, containing sample of Serenity Votives); section I.B, *supra* (describing St. Tropez Cardinal Bowl by comparison to St. Tropez CLS, as well as the wording that appears on all boxes).  Moreover, the Pomeroy executive has attested to the fact that Pomeroy's customers – the retailers – sell the merchandise at issue "in their picture boxes," and that the merchandise is "always advertised and exhibited to the public as candle holders with candles."  *See* Pomeroy Affidavit ¶ 6.

*See generally* <u>Primal Lite, Inc.</u>, 182 F.3d 1362 (rejecting similar attempt by Government to broadly

define "class or kind" of goods, and endorsing "commercial fungibility" test for purposes of GRI

1(a) "principal use" analysis);[33] *see also* Pl.'s Brief at 4 (emphasizing that "in determining 'principal

use,' it is the use of the imported merchandise, and merchandise which is fungible therewith, which

is to be determined, and not the principal use of another, broader, class of goods").

      In sum, in the condition in which they were imported, the four pieces of merchandise

remaining in dispute are candle lamps, and – when fully and properly assembled – have no other

use.[34]

-----

[33]In <u>Primal Lite</u>, the Court of Appeals discussed with approval the "commercial fungibility" test that the trial court there used in determining whether the imported merchandise fell within the "class or kind" of merchandise to which it belonged, for purposes of a "principal use" analysis. *See* <u>Primal Lite</u>, 182 F.3d at 1364-65. As Pomeroy emphasizes, the <u>Primal Lite</u> approach "deals with the principal use *of the imported product*, and not a portion of that product," as the Government here suggests. *See* Pl.'s Reply Brief at 10.

      The Government's analysis in this case is similarly at odds with the <u>Carborundum</u> factors traditionally used to determine whether particular imported merchandise falls within the "class or kind" of merchandise to which the imported merchandise belongs. As Pomeroy emphasizes, "the <u>Carborundum</u> tests all deal with the characteristics, sale and use of *the imported article*, not with a given *part* of that article which may or may not be similar to a part of another article put to uses different from that of the imported article." *See* Pl.'s Reply Brief at 10 (discussing <u>United States v. Carborundum Co.</u>, 536 F.2d 373 (C.C.P.A. 1976)); *see also* Pl.'s Reply Brief at 7-10 (applying <u>Carborundum</u> factors to four pieces of merchandise at issue), 21-22.

      [34]Although this is not a close case, the outcome is particularly fact-intensive. The result might be very different given somewhat different facts. Here, the inclusion of candles with the imported merchandise (in contrast to the merchandise at issue in the Customs Bulletin notices and the Customs ruling letters cited by the Government), and the consistent, extensive, and pervasive manner in which this merchandise is promoted and sold, including the absence of even a hint of versatility of use (*compare*, *e.g.*, HQ 960499 (where protestant stated that "the articles are sold . . . as candle holders, although *they can be used in a number of ways*") (emphasis added)), are compelling. The outcome here thus sets no precedent for a case where candles are included with the merchandise, but the merchandise is not promoted and sold in the way that it is here. Nor does this decision speak to a case where candles are not included with the merchandise, but the

3.  Classification at the Subheading Level

For the reasons detailed in section III.A above, the four pieces of merchandise at issue are classifiable under heading 9405 of the HTSUS.  All that remains is to ascertain the correct subheading.

The Government candidly concedes that – if the merchandise is classifiable under heading 9405 – it is classifiable under Pomeroy's claimed classification, subheading 9405.50.40.  And a review of the other subheadings of heading 9405 identifies no possible competing tariff provision.  The four pieces of merchandise are therefore classifiable as "Lamps and lighting fittings . . . :  Non-electrical lamps and lighting fittings: Other: Other," under subheading 9405.50.40 of the HTSUS.

## IV.  Conclusion

Applying GRI 1 and GRI 2(a), the four pieces of merchandise here in dispute – the Geo Table Lighting, the St. Tropez CLS, the St. Tropez Cardinal Bowl, and the Serenity Votives  – are properly classified as "Lamps and lighting fittings . . . :  Non-electrical lamps and lighting fittings: Other: Other," under subheading MX 9405.50.40 of the HTSUS.  Pomeroy's motion for summary judgment is therefore granted, and the Government's cross-motion is denied.

---

merchandise is promoted and sold as a candle holder.

Judgment will enter accordingly as to the classification of the four specified items in dispute,

and as to the classification of all those items subject to the parties' stipulation.  *See* n.4, *supra*.


                                    _____ /s/ Delissa A. Ridgway_____
                                                Delissa A. Ridgway
                                                        Judge


Decided:   May 27, 2008
                New York, New York