# United States Court of Appeals for the Federal Circuit

2006-1387

BASF CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Frederic D. Van Arnam, Jr., Barnes, Richardson & Colburn, of New York, New York, argued for plaintiff-appellant. Of counsel was James S. O'Kelly.

Bruce N. Stratvert, Attorney, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, and Barbara S. Williams, Attorney in Charge. Of counsel on the brief was Michael W. Heydrich, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, of New York, New York.

Appealed from: United States Court of International Trade

Judge Gregory W. Carman

# United States Court of Appeals for the Federal Circuit

2006-1387

BASF CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED: August 10, 2007

_____

Before NEWMAN, LOURIE, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

This is a tariff classification case. BASF Corporation ("BASF") appeals from judgment by the United States Court of International Trade ("trial court"), following a bench trial. See BASF Corp. v. United States, 427 F. Supp. 2d 1200 (Ct. Int'l Trade 2006). BASF objects to the classification of its imported polyisobutylene amine ("PIBA") product in subheading 3811.90.00 of the Harmonized Tariff Schedule of the United States ("HTSUS"). Because the imported product is prima facie classifiable in Heading 3811 of the HTSUS, and because Heading 3811 is more specific than the heading in which BASF argues the product should be classified, we affirm the decision of the trial court.

# I. BACKGROUND

## A. The Imported Product

The facts are largely undisputed and are set forth in greater detail in the trial court's opinion, BASF Corp. v. United States, 427 F. Supp. 2d 1200 (Ct. Int'l Trade 2006) ("BASF I"). The product at issue here is manufactured by BASF's German parent, BASF AG, and is identified by the brand name "PURADD® FD-100." Id. at 1202. Its active ingredient is polyisobutylene amine ("PIBA"), which is a detergent useful for removing and preventing the buildup of harmful deposits in gasoline engines when mixed with fuel. Id. at 1203. The imported product is a liquid mixture of 53% PIBA and 47% solvent used in manufacture. Id. at 1204. That product, however, cannot practically be used in gasoline without the simultaneous addition of other chemicals. Addition of PURADD® FD-100 alone to gasoline would violate Environmental Protection Agency ("EPA") regulations, id. at 1203, and tend to cause undesirable sticking of engine valves, id. at 1204. After importing the product into the United States, BASF blends it with a synthetic carrier oil and other ingredients to form a finished "detergent control additive package," or "DCA." That DCA package is suitable for blending with gasoline to be sold at retail, because the other chemicals mixed with PURADD® FD-100 mitigate its harmful effects while still taking advantage of its detergent properties. The PIBA from the imported product is the active detergent ingredient in the finished DCA. Id. at 1203-04. The DCA package is EPA-approved for introduction into gasoline and is sold to fuel vendors. Id. at 1204. Those vendors then blend BASF's DCA package into their gasoline.

Nearly all of the PIBA product that BASF imports goes into these DCA packages. Id. at 1203. Making the DCA package simply requires mixing the PIBA product with the package's other chemical components—no chemical reactions occur during this mixing process, and the PIBA product maintains its chemical identity in the mixture. If it were commercially practical to do so, the various components of the DCA could be added to the gasoline separately to achieve the same effect.

B.      Procedural History

The entries at issue in this case took place between January and July of 2000. The United States Customs Service ("Customs," now known as the United States Bureau of Customs and Border Protection[1]) classified the imported PIBA product in subheading 3811.19.00 of the HTSUS. Neither party contends that was the correct classification. After the product entries, Customs revoked its ruling HQ 956585, which had established a policy of classifying chemical products of this type in subheading 3811.19.00, and issued a new ruling HQ 964310. That ruling concluded that the correct classification of the imported product is subheading 3811.90.00. At all relevant times, that subheading read:

> Antiknock preparations, oxidation inhibitors, gum inhibitors, viscosity improvers, anti-corrosive preparations and other prepared additives, for mineral oils (including gasoline) or for other liquids used for the same purposes as mineral oils: . . . Other.

Dissatisfied with this classification, BASF protested to Customs. That protest was denied, and BASF appealed to the Court of International Trade. BASF argued to the

---

[1]      The United States Customs Service was renamed the United States Bureau of Customs and Border Protection effective March 1, 2003. See Homeland Security Act of 2002, Pub. L. No. 107-296, § 1502, 116 Stat. 2135, 2308-09 (2002); Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. No. 108-32 (2003).

trial court that the correct classification for the imported product was subheading 3902.20.50: "Polymers of propylene or of other olefins, in primary forms: . . . Polyisobutylene: . . . other [than elastomeric, 3902.20.10]." BASF based this argument on two grounds. First, it argued that the imported product was not prima facie classifiable in Heading 3811 at all. Heading 3811 covers "prepared additives[] for mineral oils (including gasoline)," and BASF suggested that because PURADD® FD-100 underwent mixing with other chemicals before being added to gasoline, it was not itself a "prepared additive" for gasoline. Second, BASF argued that even if the imported product were prima facie classifiable in Heading 3811, Heading 3902 was more specific and thus the correct classification. See HTSUS, General Rule of Interpretation 3(a) ("The heading which provides the most specific description shall be preferred to headings providing a more general description.").

The trial court found that the imported product was a polymer of an olefin, and that it was in "primary form," since HTSUS Chapter 39 note 6 states that liquid is a primary form. BASF I, 427 F. Supp. 2d at 1211-12. Therefore, the trial court concluded that the imported product was prima facie classifiable in Heading 3902, id. at 1214, a determination neither party challenges on appeal. With respect to Heading 3811 ("prepared additives[] for mineral oils (including gasoline)"), the trial court found that the imported product was "prepared" because it had undergone "rigorous chemical transformations" during manufacture. Id. at 1215. The trial court found the imported product to be an "additive," as it was manufactured and marketed for addition to gasoline. Id. at 1216. Finally, the trial court found that the imported product was "for . . . gasoline," rejecting BASF's argument that only a DCA mixture as a whole, but not

the PURADD® FD-100 mixed into it, was an additive for gasoline. Id. at 1216. It noted that the imported product, while not certified by the EPA for introduction alone, "is registered with the EPA as a gasoline additive, is designed to impart gasoline detergency, has detergent properties, is part of the class or kind of articles that impart detergency when added to gasoline, retains its chemical properties when blended in a DCA package, and is dedicated for use as a gasoline detergent." Id. Accordingly, the trial court found that the imported product was prima facie classifiable in Heading 3811. Id. at 1222.

Having identified two headings into which the imported product was prima facie classifiable, the trial court next considered which was the more specific. Id. at 1222-23. It noted that in general, use provisions like Heading 3811 (which covers any product used as an additive for gasoline) are considered more specific than eo nomine provisions such as Heading 3902 (which identifies a class of chemicals by their structure). Id. at 1222. Agreeing with the government that "the requirements of heading 3811 are the more difficult to satisfy," the trial court determined that Heading 3811 was the more specific and therefore the correct heading in which to classify the imported product. Id. at 1223. The trial court accordingly entered judgment for the government, ordering that the imported PIBA product be classified in subheading 3811.90.00. Id. at 1224.

BASF timely appeals to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## II.   DISCUSSION

We review questions of law de novo, including the interpretation of terms in the HTSUS. Home Depot U.S.A., Inc. v. United States, No. 2006-1459, slip op. at 2 (Fed. Cir. 2007), available at http://www.fedcir.gov/opinions/06-1459.pdf (citing Rollerblade, Inc. v. United States, 282 F.3d 1349, 1352 (Fed. Cir. 2002); Better Home Plastics Corp. v. United States, 119 F.3d 969, 971 (Fed. Cir. 1997)). Here, the Court of International Trade's legal construction of tariff provisions' meaning is reviewed without deference, while its factual findings are reviewed for clear error. Id. We afford deference under the principles of Skidmore v. Swift & Co., 323 U.S. 134 (1944), to Customs' classification decisions. Warner-Lambert Co. v. United States, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing Mead Corp. v. United States, 533 U.S. 218, 219-20 (2001)).

> Under Skidmore, the degree of deference depends on the thoroughness evident in the classification ruling; the validity of the reasoning that led to the classification; consistency of the classification with earlier and later pronouncements; the formality with which the particular ruling was established; and other factors that supply a "power to persuade."

Warner-Lambert, 407 F.3d at 1209 (quoting Skidmore, 323 U.S. at 140). Customs' conclusions are "not controlling upon the courts by reason of their authority," Skidmore, 323 U.S. at 140, and "this court has an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms," Warner-Lambert, 407 F.3d at 1209 (citing Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1358 (Fed. Cir. 2001)).

A.    Prima Facie Classifiability in Heading 3811

Invoking the longstanding rule of tariff law that goods are to be classified according to their condition when imported, see United States v. Citroen, 223 U.S. 407, 414-15 (1911), BASF argues that the imported product is not a gasoline additive when

imported, because it is unsuitable for addition to gasoline by itself.  As a result, BASF suggests that classification in Heading 3811 is improper.

It is true that the imported PIBA product is not directly mixed into gasoline by itself and that other ingredients in the DCA package are blended in to mitigate its valve-sticking effects and to comply with EPA regulations.  However, the imported product is nevertheless added to gasoline.  The process of mixing PURADD® FD-100 with the other DCA ingredients does not change its chemical structure, nor its character as a detergent specially formulated for mixture with gasoline to clean engine deposits.  When PURADD® FD-100 is introduced into gasoline, it is in essentially the same condition that it was when imported.  It is therefore appropriate to characterize it as a "prepared additive[] for . . . gasoline."

The case here is analogous to the issue raised and decided in United States v. P. John Hanrahan, Inc., 45 C.C.P.A. 120 (1958).  There, the tariff provision at issue was "edible preparations for human consumption."  Id. at 121.  The imported product was wheat gum gluten, which "cannot, as a practical matter, be eaten by itself but it is commonly added to wheat flour to produce a high protein mixture which is used in making bread and other foods for dietary purposes."  Id.[2]  Despite the fact that the imported wheat gluten was not eaten alone, it was nevertheless consumed by humans following a mixing step (and also after a cooking step absent from BASF's preparation

---

[2]     The dissent in Hanrahan makes clear how inedible the imported product was without being first baked into bread.  Id. at 125 (Worley, J., dissenting) ("[I]t is not only never eaten as a food, but is insoluble in the juices of the mouth, is unpalatable and, if chewed, becomes a spongy mass which is virtually impossible to swallow—and even should it be swallowed, is indigestable.")

2006-1387                                              7

of the DCA). As a result, our predecessor court held it to be within the "edible preparations" tariff provision.

The logic used in Hanrahan can be followed here. While unmixed PURADD® FD-100 may be unpalatable to a gasoline engine, its detergent properties render it useful as a gasoline additive so long as other materials are added at the same time, just as wheat gum gluten can be consumed by humans so long as it is baked into bread. We therefore agree with the Court of International Trade that the imported product is prima facie classifiable in HTSUS Heading 3811.

B.      Relative specificity

In the alternative, BASF suggests that Heading 3902 is more specific than Heading 3811. See HTSUS, General Rule of Interpretation 3(a) ("The heading which provides the most specific description shall be preferred to headings providing a more general description."). "Under this so-called rule of relative specificity, we look to the provision with requirements that are more difficult to satisfy and that describe the article with the greatest degree of accuracy and certainty." Orlando Food Corp. v. United States, 140 F.3d 1437, 1441 (Fed. Cir. 1998). Accordingly, if BASF is correct that Heading 3902 is the more specific, the imported product must be classified in that heading regardless of whether it is also prima facie classifiable in Heading 3811.

Heading 3811, covering "prepared additives, for mineral oils (including gasoline)" is a use provision, while Heading 3902 ("Polymers of propylene or of other olefins, in primary forms") is an eo nomine provision, "as it describes the merchandise by name, not by use." Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999). When a product is designated both by a use provision and an eo nomine provision, "the

general rule [is] that . . . [the] product . . . is generally more specifically provided for under the use provision." Id. at 1380 (quoting Sports Graphics, Inc. v. United States, 24 F.3d 1390, 1394 (Fed. Cir. 1994)). This is, however, not a hard-and-fast rule, merely a "convenient rule of thumb" which is "not obligatory." Id. (quoting United States v. Siemens Am., Inc., 653 F.2d 471, 478 n.6 (CCPA 1981)).

We see no reason to deviate here from the general rule that use provisions are more specific. The Explanatory Notes corresponding to Chapter 39 of the HTSUS reveal a "very wide range of applications" for goods in Heading 3902: "for example, packaging film, moulded parts for automobiles, appliances, housewares, etc., wire and cable coating, food container closures, coated and laminated products, bottles, trays and containers for storing precision equipment, ducting, tank linings, piping for chemical plant, [and] tufted chemical backing." World Customs Organization, Harmonized Commodity Description and Coding System Explanatory Notes 725 (3d ed. 2002).[3]

Furthermore, the Explanatory Notes explicitly state that "[w]hen as a result of the addition of certain substances, the resultant products answer to the description in a more specific heading elsewhere . . . they are excluded from Chapter 39; this is, for example, the case with . . . [p]repared additives for mineral oils (heading 38.11)." Id. at 718.[4] The Court of International Trade found that substances had been added to polyisobutylene to render the final product suitable as a fuel additive: the hydrocarbon

---

[3] The uses enumerated here are for polypropylene classified in subheading 3902.10, which is separate from the subheading at issue in this case. Nevertheless, those uses are germane to the relative specificity analysis because "when determining which heading is the more specific, and hence the more appropriate for classification, a court should compare only the language of the headings and not the language of the subheadings." Orlando Food, 140 F.3d at 1440.

[4] The same statement appears in editions of the Explanatory Notes which predate the entries at issue here.

solvent in which the detergent is dissolved when imported, and the amine tail added to the polyisobutylene molecules. While this statement in the Explanatory Notes does not bind this court, there is no persuasive reason not to follow it here. Accordingly, we agree with the trial court that Heading 3811 is more specific than Heading 3902 and therefore that the imported product was properly classified in Heading 3811.

### III. CONCLUSION

Because BASF's imported PIBA product is <u>prima facie</u> classifiable in Heading 3811 of the HTSUS, and because that heading is more specific than Heading 3902, we agree with the trial court that the imported product should be classified in Heading 3811. BASF does not dispute that if Heading 3811 is chosen, subheading 3811.90.00 is the correct sub-classification. Therefore, we affirm the judgment of the Court of International Trade classifying that product within HTSUS Subheading 3811.90.00.

<u>AFFIRMED</u>

Each party shall bear its own costs.