**Slip Op. 10-52**

# UNITED STATES COURT OF INTERNATIONAL TRADE

―――――――――――――――――――――――――――

CAMELBAK PRODUCTS, LLC,       :

(successor-in-interest to CamelBak       :

Products, Inc.), 

      :

                           *Plaintiff*,

      :       Court No. 05-00249

                v.

      :

UNITED STATES,       

      :

                        *Defendant.*

      :

―――――――――――――――――――――――――――

[Defendant's Motion *In Limine* is denied; Defendant's Motion for Summary Judgment is granted; Plaintiff's Cross-Motion for Summary Judgment is denied.]

Dated:  May 10, 2010

Sandler, Travis & Rosenberg, P.A.  (Arthur K. Purcell and Larry T. Ordet); for Plaintiff.

Tony West, Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Gardner B. Miller and Jason M. Kenner); Sheryl A. French, Office of the Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, Of Counsel; for Defendant.

# OPINION

RIDGWAY, Judge:

In this action, Plaintiff CamelBak Products, LLC challenges the Bureau of Customs and Border Protection's tariff classification of merchandise imported by CamelBak from the Republic of the Philippines in 2003.[1]

―――――――――――――――――――――――――――

[1]The Bureau of Customs and Border Protection – part of the U.S. Department of Homeland Security – is commonly known as U.S. Customs and Border Protection.  The agency is referred to

The Government maintains that Customs properly classified the merchandise at issue as "travel, sports and similar bags" under subheading 4202.92.30 of the Harmonized Tariff Schedule of the United States ("HTSUS"), assessing duties at the rate of 17.8 % *ad valorem*. *See generally* Defendant's Memorandum in Support of Its Motion *In Limine* and For Summary Judgment ("Def.'s Brief"); Defendant's Memorandum in Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Reply Brief").[2]

CamelBak claims that the merchandise is instead properly classified as "insulated food or beverage bags" under subheading 4202.92.04, or, alternatively, under subheading 4202.92.08, both dutiable at a rate of 7 % *ad valorem*. *See* Brief in Support of Plaintiff's Cross-Motion for Summary Judgment, and Response to Defendant's Motion for Summary Judgment ("Pl.'s Brief"); Reply Brief in Support of Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Reply Brief").[3]

This action, which has been designated a test case, is before the Court on cross-motions for summary judgment. Also pending is the Government's Motion *In Limine*, challenging the

as "Customs" herein.

[2]All citations to the HTSUS herein are to the 2003 edition.

[3]In its opening brief, CamelBak argued that, if the subject merchandise were found to be properly classified under subheading 4202.92.04, the merchandise qualified for duty-free treatment under the Generalized System of Preferences ("GSP"), which accords special status to goods that are classified under certain tariff provisions (including subheading 4202.92.04) and are "products" of certain countries (including the Philippines). *See* Pl.'s Brief at 4-5, 6, 9, 29. However, the Government objected that CamelBak failed to set forth a GSP claim in the protest that it filed with Customs, and argued that the Court therefore lacked jurisdiction to entertain that claim. *See* Def.'s Reply Brief at 15-17. CamelBak thereafter abandoned its GSP claim as to the entries at issue in this action. *See* Pl.'s Reply Brief at 10-11.

admissibility of CamelBak's evidence proffered to establish that the subject merchandise is sufficiently insulated to maintain the temperature of beverages during transport or temporary storage. *See generally* Def.'s Brief; Brief in Opposition to Defendant's Motion *In Limine* ("Pl.'s *In Limine* Brief"). Jurisdiction lies under 28 U.S.C. § 1581(a) (2000).[4]

As discussed below, the merchandise at issue was properly classified as "travel, sports and similar bags" under subheading 4202.92.30 of the HTSUS. The Government's motion for summary judgment is therefore granted, and CamelBak's cross-motion for summary judgment is denied. In addition, the Government's Motion *In Limine* is denied as moot.

## I. Background

At issue are ten models of merchandise which CamelBak refers to as "Hydration Packs" or "Hydration Systems." *See* Pl.'s Brief at 1.[5] Each model is a textile bag with padded, adjustable shoulder straps, designed to be worn on the back during a recreational activity, such as hiking, biking, snowboarding, or rock climbing. *See* Pl.'s Brief at 2; Def.'s Brief at 2. Each of the models features both a "cargo" compartment (designed to hold food, clothing, gear, and other supplies) and a "reservoir" (bladder) compartment, which is surrounded by closed-cell polyethylene foam and is designed to carry and maintain the temperature of water or some other beverage. *See* Pl.'s Brief at

---

[4]All statutory citations herein (other than citations to the HTSUS) are to the 2000 edition of the United States Code.

[5]CamelBak markets the ten models at issue as "Scout" (Pl.'s Exh. 6(A)), "M.U.L.E." (Pl.'s Exh. 6(B)), "SnoDAWG" (Pl.'s Exh. 6(C)), "SnoBound" (Pl.'s Exh. 6(D)), "Isis" (Pl.'s Exh. 6(E)), "Ventoux" (Pl.'s Exh. 6(F)), "Ares" (Def.'s Exh. F), "Blowfish" (Def.'s Exh. G), "Day Star" (Def.'s Exh. H), and "H.A.W.G." (Def.'s Exh. I).

2; Def.'s Reply Brief at 4-5. The cargo compartment of each model differs in capacity and configuration, depending on the activity for which the model is designed. *See* Pl.'s Brief at 2. Each "reservoir" (bladder) has a capacity of between 35 and 100 ounces of liquid, depending on the model. *See id*. A piece of 40-inch plastic tubing runs from the reservoir (bladder) to a silicone mouth-piece and bite valve, to allow the wearer to drink "hands-free." *See id*.

The merchandise at issue was entered in four shipments during September and October 2003. *See* Def.'s Reply Brief, Exh. 3 (entry summaries). CamelBak entered the merchandise as "travel, sports and similar bags" under subheading 4202.92.30, in accordance with a prior Customs HQ Ruling. *See* Def.'s Reply Brief, Exh. 3 (entry summaries); HQ 96444 (Dec. 18, 2001) (ruling, at the request of CamelBak, on the classification of 11 models of CamelBak "Hands-Free Portable Hydration Systems"). CamelBak filed a timely protest, which Customs denied. This action followed.

## II. Standard of Review

Customs classification decisions are reviewed *de novo*, through a two-step analysis. *See* 28 U.S.C. § 2640; Faus Group, Inc. v. United States, 581 F.3d 1369, 1371-72 (Fed. Cir. 2009). The first step of the analysis addresses the proper meaning of the relevant tariff provisions, which is a question of law. The second step involves determining whether the merchandise at issue falls within a particular tariff provision as construed. *See* Faus Group, 581 F.3d at 1371-72 (*citing* Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998)).

Under USCIT Rule 56, summary judgment is appropriate where "there is no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. *See* USCIT

R. 56(c).  Summary judgment is thus appropriate in a customs classification case if there is no

genuine dispute of material fact (because the nature of the merchandise at issue is not in question),

such that the decision on the classification of the merchandise turns solely on the proper meaning

and scope of the relevant tariff provisions.  *See* Faus Group, 581 F.3d at1371-72.

In the present case, the parties disagree as to the meaning and scope of the tariff provisions

at issue.  They are, however, in agreement as to the nature of the imported merchandise (except to

the extent that the Government challenges CamelBak's evidence on insulation, an issue which is

rendered moot by the disposition below).  This matter is therefore ripe for summary judgment.

## III. Analysis

The tariff classification of all merchandise imported into the United States is governed by

the General Rules of Interpretation ("GRIs") and the Additional U.S. Rules of Interpretation

("ARIs"), which provide a framework for classification under the HTSUS, and are to be applied in

numerical order.  *See* BASF Corp. v. United States, 482 F.3d 1324, 1325-26 (Fed. Cir. 2007); 19

U.S.C. § 1202.[6] Most merchandise is classified pursuant to GRI 1, which provides for classification

"according to the terms of the headings and any relative section or chapter notes."  *See* GRI 1,

HTSUS.

---

[6]The HTSUS consists of the General Notes, the General Rules of Interpretation ("GRIs"),
the Additional U.S. Rules of Interpretation ("ARIs"), and Sections I to XXII of the HTSUS
(including Chapters 1 to 99, together with all Section Notes and Chapter Notes, article provisions,
and tariff and other treatment accorded thereto), as well as the Chemical Appendix.  *See* BASF
Corp., 482 F.3d at 1325-26; Libas, Ltd. v. United States, 193 F.3d 1361, 1364 (Fed. Cir. 1999)
(noting that the HTSUS is a statute, even though it "is not published physically in the United States
Code") (*citing* 19 U.S.C. § 1202).

The Government maintains that each of the ten models of CamelBak merchandise at issue is properly classified as a whole as a "travel, sports [or] similar bag[ ]" under HTSUS subheading 4202.92.30, through the application of GRI 1 (as applied by GRI 6, which controls classification at the subheading level).[7]  According to the Government, the classification analysis therefore cannot proceed beyond GRI 1, because a single tariff provision – subheading 4202.92.30 – covers each of the items in its entirety.  *See* Def.'s Brief at 6, 17-22; Def.'s Reply Brief at 1-10.

In contrast, CamelBak contends that subheading 4202.92.30 (covering "travel, sports and similar bags") "does not *completely* embrace specially designed . . . [articles] that include a fully-integrated, insulated component . . . designed to efficiently carry and maintain the temperature of a beverage."  *See* Pl.'s Brief at 16.  According to CamelBak, the items at issue constitute "composite goods" consisting of two components – a "cargo component" (which, according to CamelBak, is *prima facie* classifiable as a "travel, sports [or] similar bag[ ]"), and an "insulated beverage bag component" (which CamelBak asserts is *prima facie* classifiable as an "insulated beverage bag").  *See* Pl.'s Brief at 14-17; *see also id*. at 8; Pl.'s Reply Brief at 1-2.  CamelBak argues further that, "[b]ecause the[ ] two subheadings 'each refer to part only of the materials' contained in the [subject

---

[7]The appropriate subheading for classification is considered only after determining the proper heading.  *See* Faus Group, 581 F.3d at 1372.  And classification at the subheading level is governed by GRI 6, which specifies that:

> For legal purposes, the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the [GRIs], on the understanding that only subheadings at the same level are comparable.

GRI 6, HTSUS.

merchandise]," the merchandise cannot be classified pursuant to GRI 3(a) (which generally provides for classification under the most specific heading and is known as the "rule of relative specificity"). *See* Pl.'s Reply Brief at 2; GRI 3(a), HTSUS. CamelBak therefore concludes that each of the models at issue must be classified as an "insulated food or beverage bag" pursuant to GRI 3(b), because – according to CamelBak – it is the special "hydration" feature (*i.e.*, the so-called "insulated beverage bag component") that gives the subject merchandise its "essential character." *See* Pl.'s Brief at 8-9, 17-28; Pl's Reply Brief at 2; GRI 3(b), HTSUS.[8]

As detailed below, the items here in dispute are properly classified as "travel, sports and

---

[8]Specifically, GRI 3 provides that:

When . . . goods are, *prima facie*, classifiable under two or more headings, classification shall be effected as follows:

(a) The heading which provides the most specific description shall be preferred to headings providing a more general description. However, *when two or more headings each refer to part only of the* materials or substances contained in mixed or *composite goods* or to part only of the items in a set put up for retail sale, *those headings are to be regarded as equally specific* in relation to those goods, even if one of them gives a more complete or precise description of the goods.

(b) Mixtures, *composite goods* consisting of different materials or *made up of different components*, and goods put up in sets for retail sale, *which cannot be classified by reference to 3(a), shall be classified as if they consisted of the* material or *component which gives them their essential character*, insofar as this criterion is applicable.

(c) When goods cannot be classified by reference to 3(a) or 3(b), they shall be classified under the heading which occurs last in numerical order among those which equally merit consideration.

GRI 3, HTSUS (emphases added).

similar bags" under HTSUS subheading 4202.92.30, through the straightforward application of GRI 1 (as applied by GRI 6). Contrary to CamelBak's assertions, the special "hydration" feature of its merchandise does not preclude the items from being *prima facie* classifiable as "travel, sports and similar bags." Notwithstanding that special feature, the items are described in their entirety by the subheading "travel, sports and similar bags." Further, while the subheading "travel, sports and similar bags" describes the items at issue as a whole, the subheading "insulated food or beverage bags" does not.

GRI 3 thus has no application here, because each of the subject items is not *prima facie* classifiable under two or more subheadings. *See* GRI 3, HTSUS. Because the merchandise at issue is classifiable pursuant to GRI 1, resort to subsequent GRIs – including GRI 3(b) and its "essential character" analysis – is therefore unnecessary. *See*, *e.g.*, Mita Copystar America v. United States, 160 F.3d 710, 713 (Fed. Cir. 1998) (noting that "it is not appropriate to reach GRI 3(b) if GRI 1 dictates the proper classification for particular merchandise").

Finally, even assuming *arguendo* that CamelBak were correct in its claims that neither the subheading for "travel, sports and similar bags" nor the subheading for "insulated food and beverage bags" described the subject items in their entirety, a GRI 3(b) "essential character" analysis would nevertheless be unnecessary. Instead, as outlined below, the merchandise at issue would be classified under the remaining subheading at the same level – the residual subheading, "other," which (like subheading 4202.92.30) carries a duty rate of 17.8 %. *See* subheading 4202.92, HTSUS. Thus, contrary to CamelBak's claims, there are no circumstances under which a GRI 3(b) "essential character" analysis would be appropriate in this case.

## A.  **Application of GRI 1**

In relevant part, GRI 1 provides for classification "according to the terms of the headings and any relative section or chapter notes."  GRI 1, HTSUS.  Thus, the first step in any classification analysis is to determine whether the headings and section or chapter notes require a particular classification.  The parties here properly focus on HTSUS heading 4202,[9] which covers "knapsacks and backpacks," as well as "traveling bags" and "sports bags," in addition to "insulated food or beverage bags" and a broad range of other items.  *See* Heading 4202, HTSUS.[10]

In the absence of contrary legislative intent, HTSUS terms are to be construed in accordance with their common and commercial meaning.  *See* JVC Co. of Am. v. United States, 234 F.3d 1348, 1352 (Fed. Cir. 2000) (citation omitted).  In ascertaining the meaning of terms, courts "may rely

_____

[9]Nothing about the Court of Appeals' recent decision in Outer Circle Products is inconsistent with the classification of the merchandise at issue here under heading 4202.  *See* Outer Circle Prods. v. United States, 590 F.3d 1323 (Fed. Cir. 2010).  Although the Court of Appeals there held that, because the merchandise in that case was used to "'organize, store, protect, or carry food or beverages,' [it could not] be classified under HTSUS heading 4202," the merchandise in that case was imported in 1997, well before heading 4202 was amended to expressly include the *eo nomine* term "insulated food or beverage bags."  *See* Outer Circle Prods., 590 F.3d at 1325-26; *see also id*. at 1325 (quoting the text of heading 4202 in force at the time of importation in 1997).

[10]In its entirety, HTSUS heading 4202 covers:

Trunks, suitcases, vanity cases, attaché cases, briefcases, school satchels, spectacle cases, binocular cases, camera cases, musical instrument cases, gun cases, holsters and similar containers; *traveling bags*, *insulated food or beverage bags*, toiletry bags, *knapsacks and backpacks*, handbags, shopping bags, wallets, purses, map cases, cigarette cases, tobacco pouches, tool bags, *sports bags*, bottle cases, jewelry boxes, powder cases, cutlery cases and similar containers, of leather or of composition leather, of sheeting of plastics, of textile materials, of vulcanized fiber or of paperboard, or wholly or mainly covered with such materials or with paper.

Heading 4202, HTSUS (emphases added).

upon [their] own understanding of the terms used, lexicographic and scientific authorities, dictionaries, and other reliable information." *Id.*

The Government maintains that the ten items of CamelBak merchandise at issue fall within the common meaning and scope of the terms "traveling bags" and "sports bags," as those terms are used in heading 4202. *See generally* Def.'s Brief at 17-22. The dictionary definition of the term "travel" is "1. To go from one place to another, as on a trip; journey." *American Heritage Dictionary of the English Language* (4th ed. 2009). And the term "sport" is defined as "2. An activity involving physical exertion and skill that is governed by a set of rules or customs and often undertaken competitively. 3. An active pastime; recreation." *Id.* Further, the term "bag" is defined as "1. a. A container of flexible material, such as paper, plastic, or leather, that is used for carrying or storing items. 2. A handbag; a purse. 3. A piece of hand luggage, such as a suitcase or satchel." *Id.* Thus, incorporating the common meanings of "travel" and "bag," the term "traveling bags" covers all forms of flexible containers used by travelers to carry or store items; and, incorporating the common meanings of "sport" and "bag," the term "sports bags" covers all forms of flexible containers used by individuals to carry or store items while they are engaged in activities involving physical exertion, or active pastime or recreation.[11]

---

[11]The Explanatory Notes to Chapter 42 note that, for purposes of heading 4202, "[t]he expression 'sports bags' includes articles such as golf bags, gym bags, tennis racket carrying bags, ski bags and fishing bags." *See* Explanatory Notes to the Harmonized Commodity Description and Coding System ("Explanatory Notes"), Chapter 42, HTSUS.

The Explanatory Notes are the official interpretation of the Harmonized Commodity Description and Coding System (on which the HTSUS is based), as set forth by the World Customs Organization (the same body which drafts the international nomenclature). *See* Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1360 (Fed. Cir. 2001) (noting that Explanatory Notes are

The expression "insulated food or beverage bags" is defined in the Explanatory Notes to

Chapter 42 as covering "reusable insulated bags used to maintain the temperature of foods and

beverages during transport or temporary storage."  *See* Explanatory Notes to the Harmonized

Commodity Description and Coding System ("Explanatory Notes"), Chapter 42, HTSUS.  In

addition, the term "insulate" is defined as "2.  To prevent the passage of heat, electricity, or sound

into or out of, especially by surrounding with a nonconducting material."  *American Heritage*

*Dictionary of the English Language*.  The term "beverage" is defined as "[a]ny one of various

liquids for drinking, usually excluding water."  *Id*.  And, as discussed above, the term "bag" is

defined as "1. a.  A container of flexible material, such as paper, plastic, or leather, that is used for

carrying or storing items.  2. A handbag; a purse.  3.  A piece of hand luggage, such as a suitcase or

---

"prepared by the World Customs Organization to accompany the international harmonized schedule").  As Congress has recognized, the Explanatory Notes "provide a commentary on the scope of each heading of the Harmonized System and are thus useful in ascertaining the classification of merchandise under the system."  H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582; *see also* Guidance for Interpretation of Harmonized System, 54 Fed. Reg. 35,127, 35,128 (Aug. 23, 1989) (noting that Explanatory Notes provide a commentary on scope of each HTSUS heading, and are official interpretation of Harmonized System at international level).

Accordingly, although the Explanatory Notes "do not constitute controlling legislative history," they serve a critical function as an interpretative supplement to the HTSUS, and "are intended to clarify the scope of HTSUS [provisions], and to offer guidance in interpreting [those provisions]."  *See* Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994) (citation omitted).  The Explanatory Notes are thus highly authoritative – "persuasive" and "'generally indicative of the proper interpretation of a tariff provision.'"  *See* Agfa Corp. v. United States, 520 F.3d 1326, 1329-30 (Fed. Cir. 2008) (*quoting* Degussa Corp. v. United States, 508 F.3d 1044, 1047 (Fed. Cir. 2007)).

All citations to the Explanatory Notes herein are to those in place as of the date of importation of the merchandise here at issue.

satchel." *Id*. Thus, considering the common meaning and scope of the terms "insulate," "beverage," and "bag," read in light of the relevant Explanatory Note, the term "insulated beverage bags" covers all forms of flexible, reusable containers that are used to maintain the temperature of potable liquids during their transport or temporary storage.

Finally, the term "backpack" is defined as "1. A knapsack, often mounted on a lightweight frame, that is worn on a person's back, as to carry camping supplies." *American Heritage Dictionary of the English Language*. "Knapsack," in turn, is defined as "[a] bag made of sturdy material and furnished with shoulder straps, designed for carrying articles such as camping supplies on the back." *Id*.; *see also* United States v. Standard Surplus Sales, Inc., 667 F.2d 1011 (C.C.P.A. 1981) (concluding, in context of Tariff Schedule of the United States (the predecessor to the HTSUS), that "knapsack" and "backpack" refer to substantially identical merchandise).

All ten models of the subject merchandise are bags made of sturdy material, which feature padded, adjustable shoulder straps, and which are designed to permit supplies and gear to be carried on the wearer's back. Thus, whether or not the items at issue can also be described as "traveling bags," "sports bags," or "insulated beverage bags," it is clear that they fit comfortably within the definition of "backpacks" or "knapsacks." The merchandise is therefore properly classifiable under heading 4202 of the HTSUS.

At the next level, there are four competing subheadings of heading 4202. *See* Heading 4202, HTSUS. The merchandise is patently not "trunks, suitcases, vanity cases, attache cases, briefcases, school satchels and similar containers," "[h]andbags, whether or not with shoulder strap, including those without handle," or "[a]rticles of a kind normally carried in the pocket or in the handbag." The

proper classification at this level is therefore "[o]ther," as the parties agree.

The three competing subheadings at the next level divide merchandise based on whether it has an "outer surface of leather, of composition leather or of patent leather" (subheading 4202.91), an "outer surface of sheeting of plastic or of textile materials" (subheading 4202.92), or "[o]ther" (subheading 4202.99). *See* Heading 4202, HTSUS. There is no dispute that the merchandise here has an "outer surface of sheeting of plastic or of textile materials." The merchandise is thus properly classifiable under subheading 4202.92. *See* Subheading 4202.92, HTSUS.

It is at the next level of tariff subheadings that the Government and CamelBak part company. At this level, there are four competing subheadings: "[i]nsulated food or beverage bags," "[t]ravel, sports and similar bags," "[m]usical instrument cases," and "[o]ther." *See* Subheading 4202.92, HTSUS. Additional U.S. Note 1 explains that the expression "travel, sports and similar bags" refers expansively to "goods, other than those falling in [specified subheadings not relevant here], of a kind designed for carrying clothing and other personal effects during travel, including *backpacks* and shopping bags of this heading . . . ." *See* Additional U.S. Chapter Note 1, Chapter 42, HTSUS (emphasis added). As discussed above, the merchandise here can be properly described as "backpacks." Pursuant to Additional U.S. Note 1, the merchandise therefore falls within the tariff provision covering "travel, sports and similar bags," and is *prima facie* classifiable thereunder.

Pointing to the language of Additional U.S. Note 1, which indicates that "travel, sports and similar bags" are "designed for carrying clothing and other *personal effects*," CamelBak asserts that water that is not in a bottle or other container is not a "personal effect," and that the merchandise at issue here therefore cannot be classified as "travel, sports and similar bags." *See* Additional U.S.

Chapter Note 1, Chapter 42, HTSUS (emphasis added); Pl.'s Reply Brief at 4-6. But CamelBak's

argument cannot carry the day. The merchandise at issue is, in fact, "designed for carrying clothing

and other personal effects," within the meaning of Additional U.S. Note 1. Even more to the point,

the language that CamelBak highlights is not exclusive. Nothing in the language of Additional U.S.

Note 1 states that "travel, sports and similar bags" must be designed to carry *only* "personal

effects."[12] Thus, even if – as CamelBak claims – water that is not in a bottle or other container is

not a "personal effect," the merchandise here is nevertheless *prima facie* classifiable under the

subheading covering "travel, sports and similar bags."[13]

     Moreover, the water-carrying and -dispensing functionalities of the merchandise at issue do

not remove the merchandise from the purview of "travel, sports and similar bags," an *eo nomine*

_____

[12]Reading Additional U.S. Note 1 in such a literal and cramped fashion would also mean that bags designed to carry a tennis racket, fishing gear, or golf clubs, but not clothing, could not be classified under subheading 4202.92 as "travel, sports and similar bags" – clearly an untenable result. *See* Additional U.S. Chapter Note 1, Chapter 42, HTSUS (stating that "travel, sports and similar bags" are "designed for carrying *clothing* and *other* personal effects") (emphases added); Explanatory Notes, Chapter 42, HTSUS (explaining that, for purposes of heading 4202, "[t]he expression 'sports bags' includes articles such as golf bags, gym bags, tennis racket carrying bags, ski bags and fishing bags"); Subheading 4202.92, HTSUS.

[13]The Government argues that – for purposes of Additional U.S. Note 1 – Customs has construed the term "personal effects" to encompass food and beverages (including water), a position which the Government contends is entitled to Skidmore deference here. *See* Def.'s Brief at 19-21; Def.'s Reply Brief at 3, 13-15. However, unlike the water in this case, the water contemplated in the prior Customs rulings on which the Government relies was water in bottles or other similar containers. *See*, *e.g.*, HQ 953458 (April 16, 1993). Customs' assertedly longstanding position therefore has no bearing on this case, and is entitled to no deference.

     For the reasons outlined above, however, there is no need to decide whether water like that at issue here is a "personal effect" within the meaning of Additional U.S. Note 1. *See* Def.'s Reply Brief at 5 (arguing that water is a "personal effect" even if it is not carried in a "traditional bottle"). Even assuming that water which is not in a bottle or other container is not a "personal effect" (as CamelBak claims), CamelBak still cannot prevail.

tariff provision which covers all forms of the named article. *See*, *e.g.*, E.T. Horn Co. v. United States, 367 F.3d 1326, 1332 (Fed. Cir. 2004) (explaining that "*eo nomine* provisions . . . include all forms of the named article") (citation omitted); Nootka Packing Co. v. United States, 22 C.C.P.A. 464, 469-70 (1935) (same).[14]  It is well-settled that "[a]n article which has . . . been 'improved or amplified' is not excluded from an *eo nomine* designation." *See* Wagner Spray Tech Corp. v. United States, 31 CIT 676, 682, 493 F. Supp. 2d 1265, 1271 (2007) (*citing* Casio, Inc. v. United States, 73 F.3d 1095, 1098 (Fed. Cir. 1996); JVC, 234 F.3d at 1352).

In short, because they incorporate a special feature which allows wearers to efficiently carry and dispense cool water or other beverages (and thus permit users to avoid carrying bottled drinks in their packs), the items at issue here may be upscale, specialized, "improved" versions of traditional backpacks. But they are backpacks nonetheless, and they are *prima facie* classifiable under the very broad tariff provision covering "travel, sports and similar bags."

In contrast, the merchandise is plainly not classifiable as "musical instrument cases," another subheading at the same level. *See* Subheading 4202.92.50, HTSUS. Nor is the merchandise classifiable under the residual provision, "other," because – as discussed above – the items are classifiable under a different subheading at the same level, as "travel, sports and similar bags." *See* Subheading 4202.92, HTSUS. The sole remaining subheading at this level covers "insulated food or beverage bags." *See id.* And CamelBak's merchandise is not classifiable under that provision either. "Insulated food or beverage bags" is simply too narrow, and too specific, to describe each

---

[14]An *eo nomine* provision is one which "'describes the merchandise by name, not by use.'" *See* BASF Corp. v. United States, 497 F.3d 1309, 1315 (Fed. Cir. 2007) (*quoting* Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999)).

of the items at issue *as a whole*.

As a threshold matter, it is uncontroverted that only a portion of each of the ten subject items is designed to carry water, while the remainder of the capacity is designed to carry "cargo." *See* Pl.'s Exhs. 6(A)-6(F); Def.'s Exhs. F-I; Pl.'s Brief at 15 (distinguishing between "the cargo component" and the "beverage bag component" of the items). An examination of the specific merchandise at issue here discloses that there is simply too much that is designed to carry cargo (rather than beverages) to permit the items to be fairly described as "beverage bags," whether insulated or not. *See* Pl.'s Exhs. 6(A)-6(F); Def.'s Exhs. F-I; Simod Am. Corp. v. United States, 872 F.2d 1572, 1578 (Fed. Cir. 1989) (observing that "the merchandise itself is often a potent witness in classification cases") (*citing* Marshall Field & Co. v. United States, 45 C.C.P.A. 72, 81 (1958)). For this reason alone, CamelBak's merchandise cannot be classified under the subheading covering "insulated food or *beverage bags*." *See* Subheading 4202.92 (emphasis added).[15]

---

[15]CamelBak notes that Customs "[has] classified CamelBak's hydration systems with up to 110 cubic inches of cargo volume as insulated beverage bags, and systems with larger cargo volume as 'backpacks.'" Pl.'s Brief at 15 (*citing* HQ 964444); *see also id*. at 12 (asserting that some Customs rulings since 2002 have "arbitrarily [drawn] a line between 'insulated beverage bags' and 'travel, sport and similar bags' based on the capacity of the storage area alone").

It thus appears that, at least in some cases, Customs has ruled that merchandise is classifiable as "insulated beverage bags" notwithstanding the existence of at least some cargo capacity designed to carry things other than beverages. However, there is no need here to definitively decide the extent – if any – of the cargo capacity that merchandise may have and still be classifiable as an "insulated food or beverage bag[ ]" under subheading 4202.92. For purposes of the specific merchandise at issue in this action, it is enough to say that there is simply too much that is designed to carry cargo (rather than beverages) to permit the items to be fairly described as "beverage bags," whether insulated or not.

Further, even assuming that the items at issue could be described as "*beverage* bags" (which they cannot), the merchandise nevertheless still could not be classified as "*insulated* food or beverage bags." Specifically, it is uncontroverted that any insulation is confined solely to the bladder (reservoir) portion of the items, and that the cargo portion is not insulated. *See*, *e.g.*, Pl.'s Brief at 13 (stating that insulation "completely surrounds the reservoir" portion of each item) (emphasis omitted); Pl.'s Exhs. 6(A)-6(F); Def.'s Exhs. F-I.[16] For this reason too, the subject merchandise cannot be classified under the subheading for "insulated food or beverage bags." An examination of the ten specific items at issue here confirms that there is simply too much of each of those items that is not insulated to permit them to be fairly described as "*insulated* food or beverage bags." *See* Pl.'s Exhs. 6(A)-6(F); Def.'s Exhs. F-I; Simod, 872 F.2d at 1578 (noting that sample of subject merchandise can be "a potent witness"); Subheading 4202.92, HTSUS (emphasis added); *see generally* Def.'s Reply Brief at 8-9 (arguing that subject items' "uninsulated cargo space" precludes their classification as "insulated food or beverage bags").[17]

_____

[16]Invoking Daubert, the Government challenges the admissibility of, and moves to exclude, the evidence that CamelBak proffers to establish that the subject merchandise is sufficiently insulated to maintain the temperature of beverages during transport or temporary storage. *See* Def.'s Brief at 2, 5-15, 22-25; Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). There is, however, no need to reach the issue here, because – even assuming that the bladder (reservoir) portion of the items at issue is insulated as CamelBak claims – CamelBak nevertheless cannot prevail. Accordingly, in light of the result set forth below, the Government's Motion *In Limine* is denied as moot.

[17]There is no need to definitively decide here whether the entirety of a beverage bag must be insulated in order to be classifiable as an "insulated food or beverage bag[ ]" under subheading 4202.92. For purposes of classifying the specific merchandise at issue in this action, it suffices to note that there is simply too much of each of the subject items that is not insulated to permit them to be fairly described as "*insulated* food or beverage bags."

The merchandise at issue is therefore classifiable as "travel, sports and similar bags" under HTSUS subheading 4202.92. "Travel, sports and similar bags" are, in turn, classified at the next level based on whether they have an "outer surface of textile materials" or something "other." *See* Subheading 4202.92, HTSUS; Subheading 4202.92.45, HTSUS. Here, it is undisputed that the outer surface is made of textile materials, but not "of vegetable fibers and not of pile or tufted construction." *See* Subheading 4202.92, HTSUS; Pl.'s Exhs. 6(A)-6(F); Def.'s Exhs. F-I; Pl.'s Brief at 21 (noting that subject items have "outer textile shell"). The merchandise was thus properly classified as "Travel, sports and similar bags: With outer surface of textile materials: Other," under subheading 4202.92.30 of the HTSUS, dutiable at the rate of 17.8 %.

## B. CamelBak's Claims

As discussed in section III.A above, CamelBak maintains that the merchandise at issue here is not classifiable pursuant to GRI 1 (as applied by GRI 6), because – according to CamelBak – there is no single subheading which completely describes the entirety of each of the items. *See* Pl.'s Brief at 14-17; Pl.'s Reply Brief at 1-2. CamelBak contends that the subject items are "composite goods" made up of a "cargo component" (which component CamelBak contends is *prima facie* classifiable as a "travel, sports or similar bag"), and an "insulated beverage bag component" (which CamelBak asserts is *prima facie* classifiable as an "insulated food or beverage bag[ ]"). *See* Pl.'s Brief at 2, 8, 14-17; Pl.'s Reply Brief at 1-2. CamelBak argues that the merchandise therefore must be subject to a GRI 3(b) "essential character" analysis, and concludes that such an analysis results in classification under the subheading covering "insulated food or beverage bags," because the merchandise's essential character is assertedly imparted by the so-called "insulated beverage bag"

component. *See* Pl.'s Brief at 8-9, 17-28; Pl.'s Reply Brief at 2; GRI 3(b), HTSUS.[18]

As explained above, however, there is no merit to CamelBak's claims. The mere fact that a piece of merchandise may consist of more than one component does not necessarily make that merchandise a "composite good" subject to classification under GRI 3(b). *See* Pomeroy Collection, Ltd. v. United States, 32 CIT ____, ____, 559 F. Supp. 2d 1374, 1391-92 (2008) (footnote omitted). GRI 3(b) applies only if "no one provision exists in the Harmonized System that provides for the [composite good] . . . *as a whole*." *See id.* (*quoting* U.S. Customs and Border Protection, "What Every Member of the Trade Community Should Know About Tariff Classification" at 19 (May 2004)) (emphasis added in Pomeroy).

The linchpin of CamelBak's argument is its assertion that – due to the special hydration feature in its merchandise (the so-called "beverage bag component") – the items at issue are not completely described as "backpacks" and thus are not *prima facie* classifiable under the broad subheading covering "travel, sports and similar bags." *See* Subheading 4202.92, HTSUS; Additional U.S. Chapter Note 1, Chapter 42, HTSUS (explaining that "travel, sports and similar bags" refers to "goods . . . of a kind designed for carrying clothing and other personal effect during travel, including backpacks"). But, contrary to CamelBak's assertions, the fact that the ten items incorporate an assertedly insulated water-carrying and -dispensing feature in addition to the other

---

[18]CamelBak argues that Customs rulings in the past have treated merchandise similar to that at issue here as GRI 3(b) composite goods. *See* Pl.'s Brief at 10-12; Pl.'s Reply Brief at 4-5. The analysis in those Customs rulings is less than rigorous, however, and often proceeded perfunctorily to a GRI 3(b) analysis without first considering whether the goods at issue were classifiable pursuant to GRI 1. In addition, the rulings did not consider the precise language of the headings and subheadings at issue here. Moreover, the rulings lack any judicial *imprimatur*. Any reliance on the rulings is therefore misplaced.

cargo-carrying capabilities characteristic of traditional backpacks does not alter the merchandise's classification.

There is nothing about incorporating into a backpack a compartment designed to contain (and maintain the temperature of) beverages that makes the backpack *not* a backpack. "An automobile's tariff classification does not differ depending on whether it is a stripped-down model designed solely as basic transportation or a high-end luxury sedan supplied with every conceivable option and amenity. *See* Heading 8703, HTSUS (covering 'Motor cars and other motor vehicles principally designed for the transport of persons . . . , including station wagons and racing cars')." Pomeroy, 32 CIT at ____ n.20, 559 F. Supp. 2d at 1392 n.20. "Just as a 'motor vehicle' is a 'motor vehicle,'" so too a "backpack" is a "backpack," no matter how simple or how elaborate it may be. *See id*. "Nothing limits classification [as "travel, sports and similar bags" under subheading 4202.92] to merchandise consisting of only that which is absolutely integral and indispensable to the function of [carrying non-beverage cargo]." *See id*. "Similarly, the fact that [insulated beverage bags] would be classifiable under [subheading 4202.92.04 or subheading 4202.92.08] if imported separately (rather than incorporated into the [backpacks] at issue here) is of no moment." *See id*. Merchandise must be classified in the condition in which it is imported. *See* BASF Corp. v. United States, 497 F.3d 1309, 1314 (Fed. Cir. 2007) (*citing* United States v. Citroen, 223 U.S. 407, 414-15 (1912)).

In short, contrary to CamelBak's claims, each of the items at issue *as a whole* is classifiable as a "travel, sports [or] similar bag[ ]" under subheading 4202.92. Further, not even CamelBak contends that each of the items at issue *as a whole* is classifiable as an "insulated food or beverage bag[ ]" under subheading 4202.92. *See*, *e.g.*, Pl.'s Brief at 15 (noting that CamelBak "does not

dispute" Government's statement that "the subject articles are not completely described as 'insulated food or beverage bags'").[19] Nor is the subject merchandise classifiable under either the subheading covering "musical instrument cases" or the residual subheading, "other" – the only two additional subheadings at the same level. *See* Subheading 4202.92; *see also* section III.A, *supra*. As such, GRI 3 simply has no application here.

By its terms, GRI 3 applies only where "goods are, *prima facie*, classifiable under two or more headings [or subheadings]." *See* GRI 3, HTSUS. As set forth above, however, each of the items in dispute is, as a whole, *prima facie* classifiable as a "travel, sports [or] similar bag[ ]" under HTSUS subheading 4202.92; and there are no other competing subheadings at the same level. There is therefore no need to reach GRI 3(b) and its "essential character" test, which apply only where – unlike here – there is no one tariff provision which covers the merchandise as a whole.

Finally, even assuming *arguendo* that CamelBak were correct in its assertion that neither the subheading for "travel, sports and similar bags" nor the subheading for "insulated food or beverage

---

[19]At times, CamelBak seems to waffle slightly on this point. *See*, *e.g.*, Pl.'s Brief at 14 n.12 (noting that the Complaint included a count pleading that the merchandise is classifiable as "insulated food or beverage bags" by application of GRI 1, but clarifying that "as counsel has . . . more recently represented to [the] Court, CamelBak believes that GRI 3(b) . . . is the best approach given the composite nature of the articles"); Pl.'s Reply Brief at 3 (stating that "[w]hile [CamelBak] believe[s] the phrase 'insulated food or beverage bags' may be broad enough to contemplate an insulated bag designed to store food or beverages *and* incidental effects, . . . this issue is more appropriately analyzed under GRI 3"); *id*. at 8 (asserting that, although specified cases "support an argument that the Hydration Systems are GRI 1 *insulated food or beverage bags*," CamelBak "maintains that the more correct path for determining classification of these articles runs through GRI 3") (emphasis omitted). Because it has not substantively briefed the point, CamelBak has abandoned any argument that each of the items at issue, as a whole, is classifiable as an "insulated food or beverage bag[ ]." But, in any event, as discussed in section III.A above, there is no merit to the claim.

bags" describes the merchandise at issue as a whole, GRI 3(b) and its "essential character" test would nevertheless have no application. As noted above, there are four subheadings at the level in dispute – "insulated food or beverage bags," "travel, sports and similar bags," "musical instrument cases," and "other." *See* Subheading 4202.92, HTSUS. The merchandise plainly cannot be described as "musical instrument cases." Accordingly, if (as CamelBak maintains) neither "travel, sports and similar bags" nor "insulated food or beverage bags" covered the whole of each of the ten items, then the merchandise would be classified under the remaining subheading at that level – the residual subheading covering "[o]ther" merchandise, which (like the subheading covering "travel, sports and similar bags") would ultimately render CamelBak's merchandise dutiable at the rate of 17.8 %. *See* Subheading 4202.92, HTSUS.[20] Contrary to CamelBak's claims, there would be no cause to reach GRI 3(b).

---

[20]Specifically, in this hypothetical scenario, the merchandise at issue would be classified under subheading 4202.92.90: "Trunks, suitcases . . . ; traveling bags, insulated food or beverage bags, toiletry bags, knapsacks and backpacks, handbags, shopping bags, wallets, purses, map cases, cigarette cases, tobacco pouches, tool bags, sports bags, bottle cases, jewelry boxes, powder cases, cutlery cases, and similar containers, . . . of textile materials . . . : Other: With outer surface of sheeting of plastic or of textile materials: Other: Other," dutiable at 17.8 %.

## IV.  Conclusion

For the foregoing reasons, the ten models of CamelBak merchandise at issue in this action were properly classified as "Travel, sports and similar bags" under subheading 4202.92.30 of the HTSUS.  The Government's motion for summary judgment is therefore granted, and CamelBak's cross-motion for summary judgment is denied.  In addition, the Government's Motion *in Limine* is denied as moot.

Judgment will enter accordingly.


                                              /s/ Delissa A. Ridgway
                                        _____
                                                 Delissa A. Ridgway
                                                        Judge


Decided:  May 10, 2010
          New York, New York